[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Dean,* Slip Opinion No. 2015-Ohio-4347.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-4347

THE STATE OF OHIO, APPELLEE, *v.* DEAN, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Dean,* Slip Opinion No. 2015-Ohio-4347.]**

*Criminal law—Aggravated murder—Joinder—Sufficiency of the evidence—Merger—Appropriateness and proportionality of death penalty—Death penalty affirmed.*

(No. 2011-2005—Submitted May 5, 2015—Decided October 27, 2015.)

APPEAL from the Court of Common Pleas of Clark County,

No. 05 CR 0348.

————————

LANZINGER, J.

{¶ 1} Jason Dean was found guilty of all charged offenses and was sentenced to death for the aggravated murder of Titus Arnold and the attempted murder of six other people.  On direct appeal, we reversed Dean's convictions, vacated the death sentence, and remanded the case for a new trial.  *See State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97.

**{¶ 2}** In this direct appeal of Dean's convictions upon retrial, we affirm the convictions and sentence of death.

## I. Trial evidence

**{¶ 3}** Evidence introduced at trial showed that between April 10 and 14, 2005, Dean shot at two people at a Mini-Mart convenience store, committed a drive-by shooting, and was responsible for the murder of Titus Arnold.

### A. Shooting at the Mini Mart

**{¶ 4}** The prosecution introduced evidence showing that during the early morning of April 10, 2005, Andre Piersoll and Yolanda Lyles drove to a Mini Mart. Lyles parked in front of the Mini Mart. According to Lyles, Dean approached the car and tried to sell them some pills while she had her money out. Following this conversation, Dean walked over to a two-door car, where a "tall white boy" was waiting,[1] and left.

**{¶ 5}** Piersoll knew Dean and testified that he first saw him inside the store. Piersoll got some snacks and returned to the car. According to Piersoll, Dean came to the car while he and Lyles were eating and talked to him about "some Valiums." Piersoll said he did not want to buy them.

**{¶ 6}** Lyles testified that she and Piersoll remained parked outside the Mini Mart for another five or ten minutes. While they were talking, Dean came around the corner of the Mini Mart and approached their car. Dean told Lyles, "Give me your money," and started shooting at the car. Several bullets hit the windshield. Piersoll told Lyles that he had been shot. Lyles then left the parking lot and quickly drove to Mercy Hospital. Lyles noticed that until she was about a block from the hospital, the car with the shooter continued to follow them.

---

[1] Dean was identified as the shorter of the two men, and Joshua Wade was identified as the taller.

**{¶ 7}** At the hospital, Piersoll was treated for a gunshot wound to the left arm and an abrasion to the right cheek. A spent .25-caliber bullet was retrieved from the sleeve of Piersoll's jacket. Lyles had scratches on her face but did not require treatment.

**{¶ 8}** The police recovered two .25-caliber shell casings outside the Mini Mart. Timothy Duerr, a forensic scientist assigned to the Firearms and Toolmarks Identification Section of the Miami Valley Crime Laboratory, determined that the two casings were fired from the same firearm.

**{¶ 9}** On April 21, Detective Darwin Hicks prepared a photographic spread and showed it to Piersoll. Piersoll identified Dean as the person who shot him.

**{¶ 10}** Crystal Kaboos, Dean's girlfriend at the time, testified that he showed her a newspaper article about the Mini Mart shooting. He then said that he was the shooter. Dean told Kaboos that he "ran up on the car and just fired through the windshield at the person."

### B. Drive-by shooting on Dibert Avenue

**{¶ 11}** Kaboos testified that on the evening of April 12, 2005, Dean talked with his brother, Mark Dean, about looking for a car and a house on Dibert Avenue in Springfield. Later that evening, Dean, Joshua Wade, and Kaboos drove to Dibert Avenue in Dean's Buick Riviera. According to Kaboos, Wade was driving, Dean was in the front passenger seat, and she was in the backseat. Kaboos stated that Wade was armed with a "black .45" and Dean had a "smaller, silver gun." Kaboos asked Dean and Wade what they were doing, and they said that they were "just looking for a house and a car."

**{¶ 12}** Kaboos stated that when they arrived at Dibert Avenue, Wade turned off the headlights, and they drove down the street. Kaboos saw Dean and Wade stick their guns out the passenger window and fire several shots. Kaboos closed her eyes and covered her ears and ducked down in the backseat. She then felt the

car speed up and turn around. But Kaboos stated that was the last thing she remembered.

{¶ 13} Laroilyn Byrd testified that she and her sister, Jinada Madison, who lived at 604 Dibert Street, were in the living room when the shots were fired and that bullets started flying through the room. The two women took cover, and Byrd called 9-1-1 to report the shooting. Neither Byrd nor Madison was hit. Byrd then went outside and saw people come onto the porch at 609 Dibert Avenue, the house across the street.

{¶ 14} Seven people were inside the home at 609 Dibert. Shani Applin testified that Devon Williams Sr., his girlfriend, Shanta Chilton, Shanta's brother, Hassan Chilton, Applin, and Applin's young child, JaeAda Applin, were in the front room watching TV. Shanta's two young children, Dyier and Samiara, were in bed inside the house.

{¶ 15} According to Shanta, Williams's car was parked across from the house, partially in front of Byrd's house at 604 Dibert. After hearing the gunfire and his car alarm go off, Williams and Shanta went outside to look at his car. Hassan, Applin, and JaeAda went out to the front porch. Williams noticed that his car had numerous bullet holes, particularly near the gas tank.

{¶ 16} Shanta testified that while they were examining Williams's car, she noticed a car coming towards them. Shanta ran back to the house. As she got to the porch, the car stopped in front of the house. Shanta then saw a "white guy" in the car look at her and start shooting. When the gunfire erupted, everyone on the porch dove for cover. No one was injured by the gunfire, but Hassan later noticed a bullet hole in his jacket.

{¶ 17} Williams testified that he had remained by his car, an Oldsmobile, when the shooting started again. Williams saw a young person shooting at the house but did not see anyone else in the car. He later identified the shooter as Wade.

4

**{¶ 18}** Investigators found five bullet holes in the left rear quarter panel of the Oldsmobile. In addition, a .25-caliber bullet was recovered from the car's rear window trim. Investigators also identified two bullet holes in the living room wall at 604 Dibert. Neither bullet was recovered.

**{¶ 19}** Investigators found evidence that four bullets struck the front porch area at 609 Dibert. Timothy Shepherd, a forensic criminalist with the Springfield Police Department Crime Laboratory, determined that a bullet recovered from the front porch pillar was "probably" a .40-caliber Smith and Wesson bullet. Shepherd also determined that a spent bullet found inside the house was a .40-caliber Smith and Wesson bullet. However, no comparisons to a weapon could be made because "much of the striations and actually, the bullet jacket had been removed."

**{¶ 20}** Before trial, Dean told Manns that he was paid to do the drive-by shooting. Manns testified that Dean said that he "drove down the street, shot up the house, turned around at the end of the street, came back and shot at people coming out of the house; and one of them was holding a baby in his arms that he almost shot because the bullet actually went through his shirt sleeve."

*C. Murder of Titus Arnold*

**{¶ 21}** Kaboos testified that in early April 2005, she was living with Dean in his parents' home on East Liberty Street in Springfield. According to Kaboos, Dean and Wade would often go out at night and leave her at home. Dean told her that they went to local bars to "lure people out and rob them of their money."

**{¶ 22}** Kaboos testified that on the night after the drive-by shooting, Dean told her that he and Wade were going to the Nite Owl Tavern to rob someone. She did not go with them. The tavern's video surveillance system showed that Dean and Wade entered the tavern about 11:45 p.m. They left at 11:47 p.m.

**{¶ 23}** According to Titus Arnold's coworker, Arnold left his work at "Visions for Youth," a group home for troubled youth on West High Street

sometime before midnight on April 13. She said that he was wearing a gold-colored jacket and carrying a backpack.

{¶ 24} Amrosetta Haile testified that she was driving on West High Street that night when a speeding car passed her and pulled into a nearby parking lot. She saw a tall man and a shorter man get out of the car and start chasing a man wearing a gold coat. She saw the taller man run back to the passenger side of the car, then saw "two blue flashes," heard gunshots, and saw the man in the gold coat fall down. According to Haile, the two men "hovered over the body for a second" and then ran back to their car and drove away.

{¶ 25} Allison Nawman and her husband, Theador Panstingel, who lived at the corner of High and Race Streets, heard a shot outside their home about the same time. According to Nawman, she looked out the window and saw a man she thought was about five feet, six inches tall standing over a person on the ground. Nawman and her husband went outside, and she saw that man running down High Street towards a car. It appeared to her that someone was already in the car because she saw the brake lights go on. She then saw the man who had been running get into the car, and the car left.

{¶ 26} About the same time that evening, Terri and Kari Epperson were at their mother's home on West High Street. Terri looked out an upstairs window and noticed that a car had pulled up across the street. She saw a man running down the street with two men chasing him. Terri then went outside and saw a person get out of the driver's side of the car, run halfway down the street, and shoot twice at the man who was running. When the shooter looked around, Terri recognized him as her cousin, Josh Wade. Wade returned to the driver's side of the car and drove away.

{¶ 27} Kari Epperson also saw the shooting. She heard squealing tires, looked out the window, and saw a car parked across the street with the driver's side door open. Kari then saw a man run down High Street and fire a gun twice. The

shooter turned around and Kari recognized him as Josh Wade. He returned to the driver's side of the car and left. Kari stated that she did not see anyone else with Wade.

**{¶ 28}** Shortly after the shooting, police and paramedic units arrived. Arnold's body was found near a curb in front of a pickup truck. No money was found in his clothing or his backpack.

*D. Beginning of murder investigation*

**{¶ 29}** Investigators found two .40-caliber shell casings near each other on West High Street. The closest shell casing was found more than 61 feet from Arnold's body. Investigators also found a projectile in the driver's side door of the pickup truck near where Arnold's body was found. A live .25-caliber bullet was found near the parking lot across the street from where the Eppersons lived.

**{¶ 30}** Early in the morning of April 14, Dean and Wade went to Mark Dean's house. Mark and Kevin Bowshier were there, getting high on cocaine. According to Bowshier, Dean and Wade "held up a bullet shell and threw it." Dean said that they had smoked somebody and robbed them. Bowshier testified: "They had ran up behind and tackled him, and I know his gun didn't go off; and then the kid Josh shot him, shot Titus." Bowshier recalled that Dean and Wade took less than $10 from the victim.

**{¶ 31}** Kaboos testified that she overheard Dean and Wade on the morning of April 15 laughing over a newspaper article about Arnold's murder. Dean told her to read the article. According to Kaboos, Dean said that they were driving down the street and saw an individual walking by himself. They stopped the car, pulled out their guns, and ordered Arnold to lie on the ground. Arnold started to run, and Dean tried to shoot him but his gun was on safety. Wade then said he had a bigger gun and shot Arnold. Dean said they robbed Arnold but got only six dollars. Kaboos testified that Dean was "bragging with a smirky grin on his face, like [he was] proud of what they had done."

**{¶ 32}** Around the same time, Dean announced that he wanted everyone in his home to watch a television newscast about the Arnold murder. According to Kaboos, "Dean was standing there with his arms crossed watching it, and he was just smiling and laughing about it."

**{¶ 33}** Kaboos stated that Dean carried a smaller silver handgun with wood on the handle and Wade carried a larger caliber handgun that was originally Dean's. Shortly after the murder, Kaboos saw Dean trade the smaller gun for drugs.

**{¶ 34}** Kaboos testified that shortly after the night of the murder, she ended her relationship with Dean and left the residence after Dean reunited with his former girlfriend, Ronda Sions. On April 20, Kaboos contacted the Springfield police and provided them with information about Arnold's murder.

### E. Dean's arrest

**{¶ 35}** On April 21, Springfield police executed a search warrant at Dean's residence. Detective Douglas Estep testified that he encountered Dean in the kitchen. The detective testified that Dean kept looking and smiling in the general direction of a stand behind him. A handgun was found on the shelf in the stand. The detective testified that the .40-caliber handgun admitted into evidence appears to be the gun he saw on the stand.

**{¶ 36}** During the search, the police found six live .380-caliber rounds in the pocket of a pair of pants, as well as an empty box of .40-caliber bullets and a box containing 18 live rounds of ammunition in a bucket in a bedroom closet. In addition, the police found a title for the Buick Riviera. The back of the title showed that Dean was the transferee. The car was parked outside Dean's house.

### F. Forensic evidence

**{¶ 37}** Dr. Robert Stewart, a Clark County deputy coroner, conducted the autopsy of Arnold. Arnold suffered a gunshot wound in the upper back at the base of his neck. The bullet cut the spinal cord in half and exited above the right eyebrow. Stewart stated that the gunshot wound was consistent with the victim

leaning over and running from the assailant. Dr. Stewart determined that this gunshot wound was the cause of death.

{¶ 38} Timothy Shepherd, the criminalist, examined the two shell casings found at the murder scene and determined that they had been fired from the .40-caliber handgun that was found at Dean's residence. Shepherd also examined a projectile removed from the pick-up truck near where Arnold's body was found. He determined that it was "probably a .40 [Smith and Wesson] caliber bullet * * * fired from a weapon that had seven lands and grooves with a left-hand twist." Shepherd was unable to identify the weapon that fired the bullet because the projectile was deformed. He testified that the class characteristics of the .40-caliber handgun found at Dean's residence was seven lands and grooves with a left-hand twist.

*G. Dean's correspondence with Sions and Manns*

{¶ 39} At trial, Dean's girlfriend, Ronda Sions, testified that Dean told her they were looking for a man known as O-Z on the night of Arnold's murder. She said that Dean said they had had a run-in and they had it out for him. According to Sions, Dean called the murder a case of mistaken identity and said that they intended to shoot O-Z, not Arnold.

{¶ 40} Sions and Dean exchanged numerous letters while he was in jail.[2] In one letter, Dean claimed that his anger and lack of control was the reason a man he "never laid eyes on before is in his grave and * * * was shot down like an animal for no reason other than he was at the wrong place at the wrong time." Dean added that, "What's so sad and it scares me when I think about it is the fact that I don't care.

{¶ 41} In another letter, Dean wrote:

---

[2] During Dean's first trial, the court admitted as exhibits the original letters. During the second trial, excerpts from the letters, rather than the original letters, were admitted as exhibits. Throughout this opinion, we refer to the excerpts admitted during the second trial.

I just lost control.  I made a lot of mistakes and I'm gonna have to pay for them.  And it is nobody's fault but my own.

{¶ 42} In yet another letter, Dean wrote:

Most of this shit is my fault.  If I hadn't gotten myself into all of this, none of this shit would be happening.

{¶ 43} Dean also wrote to Sions:

Try to stay out of trouble.  Baby, I don't need no more blood on my hands or my conscience.

{¶ 44} Dean's letters to Sions also described his close relationship with Wade.  Dean wrote:

That's some crazy shit you was telling me about Josh is going to try and say he was scared of me.  That's some bullshit.  I will call so many witnesses to testify that he looked up to me and that I treated him like a son.  I let him wear my clothes, fed him and Luther, his little brother.  I helped his whole family.  * * *  If he would just keep his fucking mouth shut, everything would be a lot better.  What he and his people fail to realize is that every time he opens his mouth, he not only hurts me but himself.  He is just digging himself a deeper hole.  They got him so scared with this life without parole bullshit that he will say whatever they want him to say.

**{¶ 45}** Manns, a fellow inmate, testified that Dean talked to him about Arnold's killing, saying: "He jumped out the car and went to rob him. Titus Arnold turned to run. He tried to fire his gun. His gun jammed, and Josh Wade jumped out of the car and shot two shots. One went into a car door, and one went into Titus Arnold's head and killed him."

**{¶ 46}** Dean also wrote several letters to Manns. In one letter, Dean wrote:

They act like I killed the president. * * * I had one hell of a time. I know that sounds crazy but you know me. I had a nice ass buick rivera power everything I had a nice system and everything * * * I was off the hook, you wouldn't believe the shit I was doing every day. I got a lot of good stories to tell you when I get there, I say that because like I said, it don't look good for me. * * * It was just me and my boy Joshua Wade you seen in the paper they got him charged with the same thing they got me charged with and they are gonna try him as an adult. I'm really worried about him if you know what I mean?

**{¶ 47}** In another letter to Manns, Dean wrote:

You are absolutely right about my situation being hopeless, but that's life. I made my choices and I knew the consequences of my actions. I have lived my life the way I wanted, I have always done what I wanted to do when I wanted to do it and fuck what anybody had to say about it.

**{¶ 48}** And in yet another letter to Manns, Dean wrote:

I'm a realist bro, and I know what is in front of me and I'm gonna face it head on, you understand where I'm coming from? Because the way the law states is it doesn't matter if I pulled the trigger or not, you know that, not to mention the fact that I'm 30 and dude was 16, I'm supposed to be the responsible adult you know.

*H. Dean's phone calls*

{¶ 49} The state also played a recording of a telephone call that Dean made from prison to an unidentified male. During this phone call, Dean states, "They're not offering no deal. * * * He's going for the death penalty, period." Dean then says that the reason no deal was being offered was because they had killed a "moon cricket."[3] Dean also discussed Wade's involvement in the murder and the strength of the state's case, stating: "Man, this chick seen everything. She seen it happen. They don't got me at the scene or nothing at that murder. She done pointed the dude out at the corner (inaudible) and everything." Dean added: This "witness came forward and ain't nothing I can do to help him now. I mean, of course, they gonna ask me, do you know anything about this. How did you get the murder weapon in your house * * *. I bought the gun off the street."

{¶ 50} The state also introduced the transcript of another phone call between Dean and an unidentified male. In that call, Dean complained about Wade's statements to the police and Kaboos, stating that Wade "said all kinds of shit" and "told that girl everything, man," and "[t]hat's how that bitch knows everything 'cause he told her."

---

[3] "Moon cricket" is a racial slur for an African-American person. http://www.urbandictionary.com/define.php?term=moon+cricket (accessed Aug. 25, 2015).

*I. Defense case*

{¶ 51} The defense called no witnesses and presented only a photograph of Wade for the jury's consideration.

**II. Case history**

{¶ 52} Dean was indicted on two counts of aggravated murder. Count Twelve charged Dean with the aggravated murder of Arnold with prior calculation and design. Count Thirteen charged him with the aggravated murder of Arnold while committing or attempting to commit aggravated robbery. Both counts contained death-penalty specifications alleging that the murder was a part of a course of conduct involving multiple murders or attempted murders, R.C. 2929.04(A)(5), and that the murder was committed while committing or attempting to commit aggravated robbery and Dean, while not the principal offender, committed the aggravated murder with prior calculation and design, R.C. 2929.04(A)(7).

{¶ 53} Dean was indicted on six counts of attempted murder: Count One—Piersoll, Count Two—Lyles, Count Seven—Shanta Chilton, Count Eight—Hassan Chilton, Count Nine—Shani Applin, and Count Ten—JaeAda Applin.

{¶ 54} Dean was also charged with eight additional counts: Counts Five and Six—discharging a firearm into an occupied structure, Counts Three and Fourteen—committing or attempting to commit aggravated robbery, and Counts Four, Eleven, Fifteen, and Sixteen—having a weapon under a disability. Additionally, firearm specifications were included in 12 counts of the indictment.

{¶ 55} A jury found Dean guilty on every charge, and he was sentenced to death. We reversed the judgment and remanded the case for a new trial. *Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 3-6. Dean pled not guilty and after a new jury was convened, he was convicted on all charges and specifications and was sentenced to death.

**III. Issues on appeal**

{¶ 56} Dean presents 15 propositions of law, including arguments regarding the application of the doctrine of transferred intent to the attempted-murder charges, the sufficiency of the evidence regarding the drive-by shooting at 609 Dibert Avenue, the failure to merge the offense of discharging a firearm into a habitation with the attempted-murder offenses, and the appropriateness and proportionality of the death sentence.

{¶ 57} We will address all the issues in the approximate order that they arose during the trial.

*A. Pretrial and trial issues*

1. *Motion for separate trials* (Proposition of Law XI)

{¶ 58} Dean argues that the trial court abused its discretion by denying a defense motion to order separate trials for the Mini Mart shooting (Counts One through Four), the drive-by shootings (Counts Five through Eleven), the murder of Arnold (Counts Twelve through Fifteen), and a weapons charge related to his arrest (Count Sixteen).

{¶ 59} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting Crim.R. 8.

{¶ 60} Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses," a trial court may grant a severance. Crim.R. 14. "The defendant, however, bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance." *State v. Brinkley*, 105 Ohio

St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29, citing *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), at the syllabus.

{¶ 61} The state may rebut a defendant's claim of prejudicial joinder in two ways. First, if in separate trials the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder. *Lott* at 163. Second, the state can refute prejudice by showing that "evidence of each crime joined at trial is simple and direct." *Id*.

{¶ 62} The different offenses were charged together because they were part of a common scheme or plan and occurred over a short period of time. Kaboos provided key testimony as to each of the offenses, and other witnesses testified regarding more than one offense. Thus, the facts indicate that joinder was proper because the offenses were part of a continuing course of criminal conduct. *See State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 63} Dean argues that he was unfairly prejudiced by the joinder of multiple counts because many witnesses and fact scenarios, as well as offenses that occurred at different times and involved different victims, created confusion and led to an attempt to convict him based on numerous bad acts. This argument lacks merit. Counts Twelve and Thirteen of the indictment—the aggravated-murder counts—contained a specification under R.C. 2929.04(A)(5) alleging that Dean had purposefully killed or attempted to kill two or more persons as part of a course of conduct. Thus, even if these two counts had been tried separately from the other counts, the state would have had to present evidence of other acts—the attempted-murder offenses—in order to prove the specification. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 51.

{¶ 64} In addition, the evidence of each crime was simple and direct. The state's first witnesses testified about the attempted murders and the robbery at the Mini Mart. The next series of witnesses testified about the drive-by shooting on Dibert Avenue. The rest of the testimony focused on Arnold's murder. It is highly

unlikely that the jury would have confused the murder evidence with the other offenses.  *See State v. Johnson*, 88 Ohio St.3d 95, 110, 723 N.E.2d 1054 (2000).

{¶ 65} Finally, Dean argues that the joinder of offenses took away his right to testify in his own behalf.  Even though he did not testify, Dean argues that he might have chosen to testify about the Dibert Avenue shootings but not the Mini Mart.  Dean also claims that he was prejudiced because he was unable to testify regarding Wade's actions during the drive-by shooting and Wade's shooting of Arnold.

{¶ 66} In *State v. Roberts*, 62 Ohio St.2d 170, 405 N.E.2d 247 (1980), we addressed a defendant's complaint that he was prejudiced by the joinder of charges because he wanted to testify on some charges but not others.  *Roberts* held:

> To prevail upon this issue, defendant must make a convincing showing that he has important testimony to give concerning one cause, and a strong need to refrain from testifying in the other. Defendant must produce sufficient information regarding the nature of the testimony he wishes to give in the one case, and his reasons for not wishing to testify in the other, so as to satisfy the court that his claim of prejudice is genuine.

*Id.* at 176.  Federal cases have also indicated that a defendant's mere desire to testify to only one count is an insufficient reason to require severance.  *See, e.g*., *Alvarez v. Wainwright*, 607 F.2d 683, 686 (5th Cir.1979); *United States v. Jardan*, 552 F.2d 216, 220 (8th Cir.1977).

{¶ 67} Dean has failed to present convincing reasons for his argument that he might have chosen to testify in one case but not in the other.  Thus, he has not shown that he was prejudiced, as required by Crim.R. 14, or that he satisfies the standard laid out in *Roberts*.

**{¶ 68}** Based on the foregoing, we reject Proposition of Law XI.

2. *Jury selection* (Proposition of Law V)

**{¶ 69}** Dean contends that jurors Nos. 342, 357, and 449 should have been removed from the jury because their answers on their jury questionnaires or during voir dire indicated that they could not be fair and impartial jurors.

*a. Juror No. 357*

**{¶ 70}** On the death-penalty questionnaire, juror No. 357 circled an answer stating that the death penalty was the "proper punishment in some cases, but not the proper punishment in some other cases." He explained that "[e]ach case is individual & some circumstances are different" and that his main concern was that "too much time [was] spent on so many appeals." During voir dire, juror No. 357 stated that his concern about the length and cost of appeals would not affect the way he looked at the evidence or weighed the aggravating circumstances against the mitigating factors.

**{¶ 71}** We have held that a "defendant in a criminal case cannot complain of error in the overruling of a challenge for cause if such ruling does *not* force him to exhaust his peremptory challenges." (Emphasis added.) *State v. Eaton*, 19 Ohio St.2d 145, 249 N.E.2d 897 (1969), paragraph one of the syllabus, *vacated in part*, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972). Thus, " '[i]f the trial court erroneously overrules a challenge for cause, the error is prejudicial only if the accused eliminates the challenged venireman with a peremptory challenge *and* exhausts his peremptory challenges before the full jury is seated.' " (Emphasis added.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 87, quoting *State v. Tyler*, 50 Ohio St.3d 24, 30-31, 553 N.E.2d 576 (1990).

**{¶ 72}** Dean argues that seated juror No. 357 should have been excused because his feelings about the death penalty were biased. But Dean waived any objection to his service. First, he failed to challenge this juror for cause. Second, he failed to excuse juror No. 357 with a peremptory challenge and failed to exercise

four of his six peremptory challenges. Thus, this claim is reviewed on the basis of plain error. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 79.

{¶ 73} Juror No. 357's answers on his death-penalty questionnaire showed that he took a moderate view of the death penalty. His main concern about the death penalty concerned the lengthy appeals process. Moreover, during voir dire, juror No. 357 assured the court that he could follow the court's instructions. Based on these answers, we hold that the trial court did not commit plain error by failing to excuse juror No. 357.

{¶ 74} Dean also argues that his counsel were ineffective by failing to challenge juror No. 357. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show first that counsel's performance was deficient and second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 75} Defense counsel were not deficient because juror No. 357's comments on his death-penalty questionnaire and his comments during voir dire did not disclose information that would have supported a challenge for cause. Dean also failed to establish that his counsel were ineffective by failing to peremptorily challenge juror No. 357. Juror No. 357 exhibited neither bias nor prejudice. Therefore, counsel's failure to challenge this juror was not deficient. *See State v. Lindsey*, 87 Ohio St.3d 479, 490, 721 N.E.2d 995 (2000).

*b. Juror No. 342*

{¶ 76} On his death-penalty questionnaire, juror No. 342 stated that the death penalty was "the proper punishment in all cases where someone is convicted of aggravated murder." During voir dire, juror No. 342 made similar comments. Juror No. 342 acknowledged that he was "opinionated" and stated that "[p]eople

do not want to be around a person who is as opinionated as me on a jury. I will do my best to convince people around me to believe in my opinions, not their own." Despite these strongly held views, juror No. 342 stated that if Dean was convicted of aggravated murder, he would follow the court's instructions and listen objectively to the mitigating factors and other matters that the defense would present in argument against the death penalty. Later, juror No. 342 reiterated that he would "absolutely" weigh the aggravating circumstances against the mitigating factors before deciding the sentence.

{¶ 77} Defense counsel challenged juror No. 342 for cause because of his strong views in favor of the death penalty. However, the trial court denied the challenge, stating, "[H]e held strong opinions about the death penalty; but nonetheless, he could put those aside and fairly consider the Court's instructions." Defense counsel later peremptorily challenged juror No. 342.

{¶ 78} Dean argues that the trial court erred by failing to remove juror No. 342 for cause because he could not be a fair and impartial juror. But Dean waived his challenge to juror No. 342 because he failed to exhaust his allotted number of peremptory challenges. Here, the trial court did not commit plain error by failing to excuse juror No. 342. Juror No. 342 told the court more than once that he would follow the court's instructions and also stated that he could fairly consider the mitigating factors in determining punishment. Thus, the record does not show that juror No. 342 could not be a fair and impartial juror, and this claim is rejected.

*c. Juror No. 449*

{¶ 79} On his questionnaire, juror No. 449 stated, "I feel [that the death penalty] is the proper punishment for *aggravated* murder. In all convicted cases." (Underlining sic.) Juror No. 449 tempered his views during voir dire. He stated that in spite of his strong feelings about the death penalty, he would have "an open mind" about the mitigation evidence, would follow the judge's instructions about the weighing process, and would fairly engage in that process. During further

questioning, juror No. 449 assured the court that he could follow the court's instructions in reaching his decision. Juror No. 449 added, "I think you have to listen to the mitigating factors because * * * each case is gonna be different." The trial court overruled a defense challenge for cause against juror No. 449. Defense counsel later exercised a peremptory challenge against juror No. 449 after he was selected as an alternate juror.

**{¶ 80}** Dean argues that juror No. 449 should have been excused for cause because he had stated that the death penalty was the proper punishment for aggravated murder. Dean waived this argument because he failed to exhaust his allotted number of peremptory challenges. He used a peremptory challenge to eliminate juror No. 449, and this action cured any error. " 'So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.' " *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 86, quoting *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Moreover, none of the alternate jurors participated in the verdict. Thus, this claim is also rejected.

**{¶ 81}** Based on the foregoing, we overrule Proposition of Law V.

3. *Evidentiary rulings* (Proposition of Law X)

**{¶ 82}** Dean argues that the trial court made several erroneous evidentiary rulings that denied him a fair trial.

*a. Testimony of Kaboos*

**{¶ 83}** Dean argues that the trial court erred by allowing Kaboos to testify about Dean's intentions to rob her and his plans to rob people at local bars. Kaboos testified that Dean told her that he had planned to rob her and her friend when he first saw them. Following a defense objection, the prosecutor claimed that Kaboos would testify that Dean decided not to rob her after he learned that she did not have any money. The prosecutor also claimed that Dean told Kaboos that he went to

20

bars at night to rob people. Defense counsel argued that Kaboos's testimony that Dean planned to rob Kaboos and her friend and that he went to bars to rob people was not relevant and was improper under Evid.R. 404(B) as other-acts testimony. The trial court overruled the objections, finding that the testimony was "probative of motive."

**{¶ 84}** Afterward, Kaboos testified that Dean told her that "he was planning on robbing me and my friend Becky out of whatever money we had, but we didn't have no money." She then stated that he changed his mind but that she didn't know why he changed his mind. Kaboos also testified that Dean often went out at night with Wade, leaving her at home. Kaboos testified that Dean told her that they were "gonna go to the local bars and lure people out and rob them of their money."

**{¶ 85}** Dean argues that Kaboos's testimony should not have been admitted to prove motive. Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible * * * [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*.

**{¶ 86}** Dean was charged with aggravated robbery and murder while committing or attempting to commit robbery for Arnold's death. The testimony that Dean planned to rob Kaboos and her friend and that he and Wade were going to bars to lure customers outside and rob them showed that Dean was intending to rob people around the time that Arnold was murdered and robbed. Thus, the trial court did not abuse its discretion in admitting Kaboos's testimony as evidence of motive. *See State v. Woodard*, 68 Ohio St.3d 70, 73, 623 N.E.2d 75 (1993) (where defendant was charged with murder in a carjacking incident, evidence that defendant previously had attempted to carjack someone was evidence of motive).

**{¶ 87}** As a final matter, Dean argues that the trial court erred in concluding that Kaboos's testimony met one of the purposes of Evid.R. 404(B) without explicitly analyzing whether the prejudicial impact outweighed its probative value.

Under Evid.R. 403(A), relevant evidence must be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "Even if the other-acts evidence is offered to prove a material element, the decision to admit this evidence is subject to Rule 403." *See* 1 Giannelli, *Evidence*, Section 404.14, at 252 (3d Ed.2010). "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 88} We have held that "Evid.R. 403(A) establishes a standard but does not require a trial court to explicitly state in its judgment entry that the probative value of the 'other acts' evidence outweighs its prejudicial impact." *State v. Bey*, 85 Ohio St.3d 487, 489, 709 N.E.2d 484 (1999). The probative value of Kaboos's testimony outweighed the damage of any unfair prejudice to Dean. Thus, the trial court's failure to explicitly state its findings on the weighing process was not reversible error.

### b. Handgun and ammunition not used in crimes

{¶ 89} Dean argues that the trial court erred by admitting a .380-caliber handgun and other evidence that was seized during a search of Wade's home.[4] The state introduced six rounds of .380-caliber ammunition that were in pants found during the police search of Dean's bedroom. The state also sought to introduce the .380-caliber handgun that was found during the search of Wade's house.

{¶ 90} Defense counsel objected to the introduction of the handgun as irrelevant, because no gun of this caliber was used in any of the offenses. The state argued, "We're attempting to show that the firearm, the .40 caliber that was issued here, is the property of Jason Dean and that Josh Wade has his own separate firearm." The trial court overruled the defense objection, stating, "I think what it

---

[4] Dean made no Fourth Amendment claims in challenging the admissibility of the .380-caliber handgun.

tends to show is the firearms were interchangeable." The state was allowed to introduce the .380-caliber handgun.

**{¶ 91}** The admission of the .380-caliber firearm and ammunition rested upon a question of relevancy. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343, at paragraph two of the syllabus.

**{¶ 92}** In *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, the state presented evidence about several firearms and ammunition found in Neyland's motel room and storage unit. The firearms were not connected to the aggravated-murder charges against Neyland. *Id*. at ¶ 157. The state argued that the evidence was relevant to prove Neyland's prior calculation and design, which was an element of the aggravated-murder charges. *Id*. at ¶ 153. We rejected that argument because the murder weapon had been identified and admitted into evidence. Thus, the other weapons and ammunition were not relevant to proving Neyland's prior calculation and design and should not have been admitted. *Id*. at ¶ 157. *See also State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 105-106 (weapons found in the defendant's basement that were not used in the murder were not relevant to prove prior calculation and design).

**{¶ 93}** Unlike in *Neyland* and *Trimble*, the state did not introduce multiple weapons to prove prior calculation and design. Rather, the .380-caliber handgun found in Wade's bedroom and the .380-caliber ammunition found in the pants in Dean's bedroom were relevant for the limited purpose of showing that Dean and Wade acted together in committing the offenses.

**{¶ 94}** Moreover, the prosecutor later relied on this evidence to rebut defense claims that Wade acted alone in committing the offenses. During final

arguments, defense counsel asserted that Wade was acting alone: "That ain't no little boy being scared by the sound of the big old gun he's holding in his hand. That's a young thug fully capable of committing this crime without guidance from anybody." In rebuttal, the prosecutor argued:

> Facts that show that they're a team? * * * They were together all day every day for 21 days. He provided the guns; he used the .25; Josh used the .40. * * * No one's talked about this yet. When they got rid of the .25, they replaced it with that .380. They had the .380 that was found down at Josh's house.

> How about this? The .380 rounds when they did the search warrant, the .380 rounds are found in the Defendant's pants in his house, and the .380's found down the street at Josh's. That doesn't show you that they're working as a team? * * * Again, that's showing you how tightly they worked together as a team.

{¶ 95} The state's argument explains why the .380-caliber handgun and ammunition were relevant. That evidence—the weapon in Wade's house and the ammunition in Dean's house—tended to show that Dean and Wade acted together in committing the charged offenses. Thus, we hold that the trial court did not abuse its discretion by admitting the .380-caliber handgun and ammunition.

*c. Letters and telephone calls*

{¶ 96} Dean argues that the trial court erred by admitting the letters that he wrote to Manns and Sions and the telephone calls that Dean made while he was in pretrial confinement.

(1) Dean's letters

{¶ 97} Detective Estep testified that the police obtained a search warrant and seized numerous letters that Dean had sent to Manns, an inmate at the Lebanon

Correctional Institute.  Estep also learned that Sions had received numerous letters from Dean.  Estep talked to Sions about the letters, and the police later collected them from Sions's house.

{¶ 98} During its case-in-chief, the state introduced redacted excerpts from letters that Dean had mailed to Manns and Sions before his trial, but the letters themselves were not admitted.  Dean raises various objections to the contents of the excerpts and argues that they should not have been admitted.

{¶ 99} First, Dean argues that several excerpts from his letters should not have been admitted, because they did nothing more than show his lack of remorse for Arnold's death.  Dean complains about the following excerpt in a letter to Manns:  "They act like I killed the president."  Dean also complains about the comments in another letter:  "Remember they said they found a .40 Caliber pistol in my house?  Well that's the type of pistol dude got killed with, but there are no prints at all on the gun."  Dean's statements in these letters were probative of his consciousness of guilt.  Thus, this evidence was relevant to a noncharacter issue and admissible under Evid.R. 404(B).

{¶ 100} Dean argues that the following excerpt from a letter to Sions should not have been admitted, because it also showed his lack of remorse:  "Anyway this dude walks up to me and says, 'that dude you and your boy killed was my cousin'. I looked at him and said, 'I don't give a fuck!' "  However, Dean's response to the accusation was admissible as an implied admission of guilt.

{¶ 101} Dean also complains that an excerpt in a letter to Sions was improperly presented to the jury:

> I get so angry sometimes, and I lose control.  * * *  It's the reason a man I have never laid eyes on before is in his grave and his children are wondering where their daddy is and his mother has to cry herself to sleep at night because her son was shot down like an

animal for no reason other than he was at the wrong place at the wrong time. What's so sad and it scares me when I think about it is the fact that I don't care.

{¶ 102} These comments were also an implied admission of guilt and not barred by Evid.R. 404(B). *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 66.

{¶ 103} Second, Dean claims that excerpts from two of his letters should not have been admitted because they showed his lack of remorse and vulgarity and that he was a dangerous individual. Initially, he complains about the admissibility of a letter he wrote to Manns: "I made my choices and I knew the consequences of my actions. I have lived my life the way I wanted, I have always done what I wanted to do when I wanted to do it and fuck what anybody had to say about it." These were probative of Dean's consciousness of guilt.

{¶ 104} In a letter to Sions, Dean wrote, "If I could just get my hands on that motherfucker I would crush him. If I could get my hands on him, there would be another mother mourning the loss of her child." Once again, Dean's comments demonstrated his consciousness of guilt and were admissible.

{¶ 105} Third, Dean argues that excerpts from other letters should not have been admitted, because they showed he was a dangerous individual with an unabashed disregard for the law. In a letter to Manns, Dean wrote: "Life's a motherfucker ain't it bro? This is what happens when you live life in the streets and make your own rules and laws. You lose everything every time. I will carry my burden with my head held high." Similarly, Dean wrote Sions: "But I got caught up living the fast life, doing what comes natural to a beast like me, doing what I wanted, when I wanted, and how I wanted." In a similar vein, Dean wrote: "Because at that point if I wanted something, I took it and damn the consequences.

But that kind of thinking has led me to where I am right now, locked in a concrete and steel cage."

{¶ 106} These excerpts all demonstrated Dean's disregard for the consequences of his actions and were relevant to prove his involvement in the offenses. But Dean's statements: "I will take some money, some jewelry, some dope. I will take your car and everything you own, but I would never take no pussy" were irrelevant and not admissible under Evid.R. 404(B). Nevertheless, the impact of these comments was minimal, considering the other compelling evidence of Dean's guilt.

{¶ 107} During the trial, Dean argued that there were no eyewitnesses identifying him at the scene of Arnold's murder and insisted that Wade was solely responsible as the killer. Yet Dean's letters contain bits of information that show his involvement in Arnold's murder and convey his consciousness of guilt for Arnold's murder and the other offenses. *See State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 86.

{¶ 108} The record shows that the state was careful in limiting the information that was contained in the excerpts that went to the jury. The evidence of other acts was not offered for the purpose of proving Dean's bad character. Moreover, information that cast Dean's character in a negative light was kept to a minimum. Thus, we hold that the trial court did not abuse its discretion in admitting the excerpts of Dean's letters to Sions and Manns.

(2) Dean's phone calls

{¶ 109} The state played a recording of a phone call that Dean made from jail and presented the transcript of another phone conversation that Dean made, both of which were made to an unidentified individual.

{¶ 110} During the recording, Dean stated, "They're not offering no deal * * * He's going for the death penalty, period." Dean added that the reason no deal

was being offered was " '[c]ause we killed a moon cricket." Dean also discussed Wade's involvement in the murder and the strength of the state's case:

> Man, this chick seen everything. She seen it happen. They don't got me at the scene or nothing at that murder. She done pointed the dude out at the corner (inaudible) and everything. I mean, ain't nothing I can do to help him. I tried to help him in the long run when we first went down. I accepted —
>
> (inaudible)
>
> I was rolling with it. I was carrying the weight, but then (inaudible) witness came forward and ain't nothing I can do to help him now. I mean, of course, they gonna ask me, do you know anything about this. How did you get the murder weapon in your house and, you know, all this shit. I bought the gun off the street.

{¶ 111} Dean argues that the trial court erred by allowing this audio recording to be played because it conveyed that Dean was a racist. But Dean's comment that they killed a "moon cricket" was an admission by Dean of his involvement in Arnold's murder. Thus, we reject Dean's claim that that the probative value of this evidence was "minimal at best."

{¶ 112} Other comments in the phone conversations were also relevant to the charges. Dean discusses the strong evidence linking Dean and Wade with Arnold's murder. Moreover, Dean tells the caller that he bought the murder weapon off the street. This was also highly probative evidence linking Dean to the murder.

{¶ 113} Dean cites *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), for the proposition that this recording should not have been presented to the jury because it portrayed him as a racist. *Dawson* held that the First Amendment precludes a state "from employing evidence of a defendant's

abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." *Id.* at 168. In *Dawson*, the jury was told that the defendant belonged to the Aryan Brotherhood, which was described as a white racist gang. *Id.* at 166. Nothing of the sort happened in this case. Dean's comment was not a mere statement of abstract beliefs but was evidence of his involvement in Arnold's murder.

**{¶ 114}** The transcript of a second phone call between Dean and an unidentified male was also presented to the jurors. In this phone call, Dean complained about Wade's statements to the police and Kaboos that incriminated Dean in the murder. Dean stated that Wade "said all kinds of shit" and "told that girl everything man," and "[t]hat's how that bitch knows everything 'cause he told her." This conversation showed Dean's consciousness of guilt and was therefore admissible.

**{¶ 115}** Dean also objects that the transcript of this phone call, which had been used as an exhibit in his first trial, included the name of the case and the fact that it was from the "Guilt Phase." It is unclear why this information was not redacted before the exhibit went to the jury. However, the trial court informed the jury that this case had been tried before and told them that they "may not consider that fact * * * for any purpose whatsoever." Thus, there is little likelihood that the reference to the prior trial was prejudicial.

**{¶ 116}** Finally, Dean argues that the transcript and the recording showed that Dean was callous, vulgar, and remorseless. He argues that this evidence was particularly prejudicial because the evidence that he was involved in the drive-by shootings and Arnold's murder was not overwhelming. However, Dean's argument overlooks Kaboos's testimony, which established his involvement in the Dibert Avenue shootings and his involvement in Arnold's murder. Thus, Dean's claim that the jury's review of his letters and telephone conversations deprived him of a fair trial is rejected.

**{¶ 117}** Based on the foregoing, we overrule Proposition of Law X.

4. *Playing 9-1-1 calls* (Proposition of Law IX)

**{¶ 118}** Dean argues that he was denied a fair trial when the prosecution played two emotionally charged 9-1-1 tapes for the jury.

*a. Haile's 9-1-1 call*

**{¶ 119}** Over defense objection, the state played a tape of the 9-1-1 call that Amrosetta Haile made following Arnold's shooting:

Speaker One [Haile]: There was two of them. They shot this other boy in the head. He's dead. I know he's dead. He wasn't moving. There was blood everyplace.

Speaker Two [9-1-1 operator]: You were passing by?

Speaker One: I was coming off of Light Street onto High. And these people were running from the shelter house across to this kid in the road right by the Night Owl intersection on High Street. They just shot him in the fuckin' head with a gun.

* * *

Speaker One: * * * The two cars — the two guys in the car parked their car. This kid started running across the road that they shot. They get out of the car and run after him and popped him right in the fuckin' road by the curb. I was right there at the track and watched them shoot this kid dead.

Speaker Two: Okay. And then they ran back to the vehicle?

Speaker One: And they ran back to the car and took off.

**{¶ 120}** Dean argues that the 9-1-1 tape was inflammatory and improperly played to the jurors' emotions. He argues that most of the tape dealt with the investigation of the crime and Haile had already testified to that information during

her direct examination. Thus, he argues that the 9-1-1 call should have been excluded because its prejudicial effect outweighed its probative value. *See* Evid.R. 403(A).

**{¶ 121}** Haile's 9-1-1 call established that two males were involved in shooting Arnold. This information supported the state's theory that Dean and Wade acted together when Arnold was killed. Though prejudicial to Dean with respect to his criminal liability, it was not unfairly so. Neither did it confuse the issues or mislead the jury. Thus, we hold that the trial court did not abuse its discretion in allowing the 9-1-1 tape to be played. *See State v. Kinley*, 72 Ohio St.3d 491, 497, 651 N.E.2d 419 (1995).

*b. Byrd's 9-1-1 call*

**{¶ 122}** Over defense objection, the state played the 9-1-1 call that Byrd made during the drive-by shooting on Dibert Avenue. Byrd told the 9-1-1 operator, "Somebody drove by and shot at the boy's car across the street, and a couple bullets hit the house." During the 9-1-1 call, the car returned, and shots could be heard on the tape. Byrd told the 9-1-1 operator that the car that was shot at was owned by Devon Williams and provided the following information:

> Speaker One [Byrd]: Devon Williams. He's had problems out of O-Z and Snuff. I know you know 'me.
>
> Speaker Two [9-1-1 operator]: O-Z and Snuff is who they think it was.
>
> Speaker One: And (Inaudible) Aaron Johnson. He's had problems out of them lately.
>
> Oh, this was—he said this was a white boy driving this car. They came by, shot the car first; and a bullet came through the house.

**{¶ 123}** Dean argues that Byrd's statement about Williams's problems with O-Z and Snuff should not have been played during the 9-1-1 call. The admissibility of Byrd's comments about O-Z involve whether her statement constitutes an excited utterance under Evid.R. 803(2). A four-part test is administered to determine the admissibility of statements as an excited utterance: (1) a startling event, (2) a statement relating to that event, (3) a statement made by a declarant with firsthand knowledge, and (4) a statement made while the declarant was under the stress of the excitement caused by the event. *See* 2 Giannelli, *Evidence*, Section 803.9, at 223-224 (3d Ed.2010); *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus; *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166 (following *Baker*).

**{¶ 124}** Byrd's comments were made to the 9-1-1 operator after her house had been hit by gunshots, and her comments were made while she was under the stress of the excitement caused by the event.

**{¶ 125}** Byrd's 9-1-1 call met the requirements for admissibility under Evid.R. 803(2). However, the evidence must also meet the requirements for relevancy under Evid.R. 401 before being admitted. We fail to see how *Byrd's statement* claiming O-Z was involved was relevant. Nevertheless, we hold that the admission of that statement was harmless beyond a reasonable doubt in view of other evidence establishing Dean's guilt in the drive-by shooting. *See State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33.

**{¶ 126}** Based on the foregoing, we reject Proposition of Law IX.

5. *Transferred intent* (Proposition of Law III)

**{¶ 127}** Dean argues that the trial court erred in providing the jury with an instruction on transferred intent with respect to the attempted-murder counts.

*a. Background*

{¶ 128} The trial court did not give an instruction on transferred intent for any of the offenses during the original charge to the jury. But during final arguments, the prosecutor argued:

> There's a lot of evidence about intent, and you have to be cognizant of a concept called transferred intent. And also when you're talking about prior calculation and design, if a team is going out there planning to go out and rob and kill, it's not necessary in the prior calculation and design that you have a specific victim in mind. That's a point that sometimes in aggravated murder cases juries get a little bit off the beaten track on.

{¶ 129} During deliberations, the jury asked: "In attempted murder does it matter if the person identified in the charge is the intended target or not?" After discussing this question with the parties, the trial court said it intended to give "an additional charge which would be a modification of Charge No. CR 417.09 from [Ohio Jury Instructions]. It's on transferred purpose."[5] The trial court's proposed

---

[5] The version of Ohio Jury Instruction CR 417.09 that was in effect during the trial stated:

> 1. PURPOSE TO CAUSE THE DEATH. If you find that the defendant did have a purpose to cause the death of a particular person and that the shot accidentally caused the death of another person, then the defendant would be just as guilty as if the shot had taken effect upon the person intended.
> 2. TRANSFERRED. The purpose required is to cause the death of another, not any specific person. If the shot missed the person intended, but caused the death of another, the element of purpose remains and the offense is as complete as though the person for whom the shot was intended had died.
> 3. NO PURPOSE. However, if there was no purpose to cause the death of anyone, the defendant cannot be found guilty * * *.

instructions applied the transfer-of-purpose instruction to the attempted-murder offenses.

{¶ 130} Defense counsel stated that the proposed instruction seemed to be a correct statement of the law but objected, stating, "The instructions have been completed and given to the jurors in writing;  and the appropriate answer, we think, on question[s] of law should be the one akin to the one given earlier that they have the instructions.  Work with them."

{¶ 131} Defense counsel added:

[T]he State seems to be of the opinion this question is targeting the Dibert Avenue drive-by victims.  If that's correct, * * * the counts in the predicate original instructions, the verdict forms identify the names of the people on the porch.  And there seems to be no valid application of the concept of transferred intent relative to that charge or that set of charges.

{¶ 132} The trial court overruled the objection and instructed the jurors as follows:

You are cautioned that this instruction doesn't supersede anything I have given you.  It doesn't change anything that I have given you, and you are only to consider this in light of the other instructions and not give this additional instruction any undue emphasis over anything else that I have already given you.

---

*Ohio Jury Instructions*, CR Section 417.09 (2009).

The answer to your question and the instruction that I will now give you is that all offenses of murder, *including attempted murder* and aggravated murder, have as one of the essential elements that the Defendant had a purpose to cause the death of another. The purpose required is to cause the death of another person, not any one specific person. If the death was intended for one person but resulted in *an attempt* on or the death of another, the offense is complete. However, if there was no purpose to cause the death of anyone, the Defendant may not be found guilty of *attempted murder*, murder, or aggravated murder.

(Emphasis added.)

### b. Analysis

{¶ 133} Dean claims that the trial court erred because the doctrine of transferred intent does not apply to the attempted murder of Lyles at the Mini Mart or the attempted murder of the four people at 609 Dibert Avenue during the drive-by shootings.

{¶ 134} As an initial matter, the state asserts that this issue is subject to plain-error review because Dean presents a theory that was not presented at trial. Crim.R. 30(A); *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990). We disagree. Defense counsel objected to the trial court's proposed transfer-of-purpose instruction before it was provided to the jurors and made several arguments challenging the instruction.

{¶ 135} Generally, a trial court has broad discretion in how to fashion jury instructions. "In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d

671 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990). Whether the jury instructions correctly state the law is a question that is reviewed de novo. *See State v. Bradford*, 4th Dist. Adams No. 11CA928, 2013-Ohio-480, ¶ 22; *State v. Cook*, 9th Dist. Summit No. 26360, 2012-Ohio-4250, ¶ 6.

{¶ 136} "The doctrine of transferred intent is firmly rooted in Ohio law." *State v. Sowell*, 39 Ohio St.3d 322, 332, 530 N.E.2d 1294 (1988). " 'If one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A).' " *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 171, quoting *State v. Solomon*, 66 Ohio St.2d 214, 421 N.E.2d 139 (1981), paragraph one of the syllabus.

{¶ 137} Dean acknowledges that the doctrine of transferred intent would apply in an aggravated-murder case but cites a California Supreme Court case to argue that transferred intent does not apply to the attempted-murder charges against him.[6] *People v. Bland*, 28 Cal.4th 313, 48 P.3d 1107 (2002). In *Bland*, the defendant shot and killed his intended victim and wounded two others. *Id*. at 319. The court reversed the defendant's attempted-murder convictions because there was no evidence that he intended to kill the two surviving victims. The court held that the doctrine of transferred intent did not apply to an inchoate crime like attempted murder. *Id*. at 327-328. *Bland* reasoned:

> The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one

---

[6] This argument does not apply to the attempted murder of Piersoll, who was shot in the arm.

person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others.

*Id*. at 328.

**{¶ 138}** Dean invokes *Bland* to argue that the doctrine of transferred intent should not be applied when a defendant is charged with attempted murder, because of the problem in identifying the intended victims. As to this issue, *Bland* stated:

"A related reason why transferred intent cannot properly apply to attempted murder derives from the fact that the crime of attempted murder requires no physical injury to the victim. * * * Assuming an attempted murder scenario where the defendant fires a shot at an intended victim and no bystanders are physically injured, one sees that it is virtually impossible to decide to whom the defendant's intent should be transferred. Is the intent to murder transferred to everyone in proximity to the path of the bullet? Is the intent transferred to everyone frightened and thereby assaulted by the shot? There is no rational method for deciding how the defendant's intent to murder should be transferred."

*Id.* at 329, quoting *Ford v. State*, 330 Md. 682, 715, 625 A.2d 984 (1993).

**{¶ 139}** Other jurisdictions have also rejected the doctrine of transferred intent when a defendant has been charged with the attempted murder of an unintended victim. *See, e.g.*, *Harrison v. State*, 382 Md. 477, 506, 855 A.2d 1220 (2004); *Ramsey v. State*, 56 P.3d 675, 681-682 (Alaska App.2002); *State v. Brady*, 745 So.2d 954, 957-958 (Fla.1999); *State v. Hinton*, 227 Conn. 301, 317-318, 630 A.2d 593 (1993); *State v. Williamson*, 203 Mo. 591, 595, 102 S.W. 519 (1907); *State v. Stanley*, 20 S.D. 18, 23, 104 N.W. 522 (1905).

**{¶ 140}** The state counters by arguing that the evidence established that Dean intended to murder Piersoll and Lyles at the Mini Mart and that he had an intent to kill during the Dibert Avenue drive-by shooting. A " 'person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' " *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 143, quoting *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978). Thus, the state argues that evidence showing that Dean or Wade fired multiple shots at all the victims established that Dean had a purpose to kill.

**{¶ 141}** The state argues that the transferred-intent doctrine was properly applied to the attempted-murder counts. "In order to commit the offense of attempted murder as defined in R.C. 2903.02(A), one must engage in conduct that, if successful, would result in *purposely* causing the death of another * * *." (Emphasis added.) *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, ¶ 25. Thus, the state argues that the doctrine of transferred intent applies to the charges because attempted murder, like murder, requires a purpose to kill.

**{¶ 142}** R.C. 2923.02(A), Ohio's attempt statute, refers to purposely or knowingly engaging in "conduct that, if successful, would constitute or result in the offense." But Dean's argument that transferred intent does not apply to the attempted-murder charges, because none of the victims was harmed, "adds an artificial requirement of *death* of the unintended victim to the transferred intent doctrine." (Emphasis sic.) *Harrison*, 382 Md. at 511, 855 A.2d 1220 (Raker, J., dissenting). Yet "the doctrine of transferred intent is not limited to killings. * * * It is instead 'a general principle which permits liability for any crime involving a *mens rea* of intent—be it arson, assault, theft or trespass—where the actual object of the crime is not the intended object.' " (Italics sic.) *Id*. at fn. 3, quoting Dillon, *Transferred Intent: An Inquiry into the Nature of Criminal Culpability*, 1 Buff.Crim.L.Rev. 501, 504 (1998).

38

**{¶ 143}** The state maintains that transferred intent does not require that the victim be harmed and cites *State v. Wheeler*, 8th Dist. Cuyahoga No. 66923, 1995 WL 322247 (May 25, 1995). Wheeler fired several shots at a passenger in a car, and one of the bullets passed through the shirt of the driver without striking him. The passenger died, and Wheeler was found guilty of his murder and the attempted murder of the driver. The court applied the doctrine of transferred intent in upholding the attempted-murder conviction.

**{¶ 144}** Another court applied the doctrine of transferred intent to a felonious assault when the victim was not physically harmed. *State v. Reese*, 1st Dist. Hamilton Nos. C-060576, C-060577, 2007-Ohio-4319, ¶ 23. The court stated:

> Where the defendant shoots wildly in a business district and one of the shots enters the passenger compartment of an occupied automobile, the conviction for attempting to cause serious physical harm should stand. The fact that there was no physical harm to Fiorini's person is irrelevant; the statute did not even require physical harm to the intended victim. * * * Under the law, the unintended victim is accorded the same protection as the intended victim. *The intent is what is transferred, not the harm.*

(Emphasis added.) *Id*. at ¶ 23. The same rationale supports the application of transferred intent to the attempted-murder counts even though neither Lyles nor any of the victims on the porch was injured.

**{¶ 145}** The victims at the Mini Mart and the drive-by shooting are also readily identified. Two people were sitting in the car and four people were standing on the front porch when the defendant opened fire. The persons to whom the defendant's intent could be transferred on the attempted-murder counts are known.

**{¶ 146}** Other jurisdictions have applied the doctrine of transferred intent to support both murder and attempted-murder convictions. *See, e.g., Ochoa v. State*, 115 Nev. 194, 200, 981 P.2d 1201 (1999) (attempted murder); *Blanche v. State*, 690 N.E.2d 709, 712 (Ind.1998) (murder and attempted murder); *People v. Hill*, 276 Ill.App.3d 683, 688, 658 N.E.2d 1294 (App.1995) (attempted first-degree murder); *State v. Rodriguez-Gonzales*, 164 Ariz. 1, 3, 790 P.2d 287 (App.1990) (attempted first-degree murder); *State v. Gillette*, 102 N.M. 695, 699 P.2d 626 (App.1985) (attempted first-degree murder).

**{¶ 147}** We hold that that the doctrine of transferred intent was properly applied to the attempted-murder charges. Attempted murder, like murder, requires a purpose to kill. The victims of the transferred intent are readily identifiable because they were standing on the porch or seated in the front seat of the car. A showing of harm is unnecessary since the "intent is what is transferred, not the harm." *Reese*, 2007-Ohio-4319, at ¶ 23. Thus, we hold that the trial court's instruction was proper.

**{¶ 148}** Based on the foregoing, we reject Proposition of Law III.

6. *Sufficiency and manifest weight of the evidence* (Proposition of Law II)

**{¶ 149}** Dean challenges the sufficiency and manifest weight of the evidence for his convictions for (1) discharging a firearm into an occupied structure, (2) the attempted murder of four persons during the drive-by shootings, and (3) the aggravated murder of Arnold with prior calculation and design under R.C. 2929.04(A)(7). He also challenges the sufficiency of the evidence for his convictions for (1) the attempted robbery of Lyles, (2) the attempted murder of Lyles, and (3) the aggravated murder of Arnold as part of a course of conduct under R.C. 2929.04(A)(5).

**{¶ 150}** In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 151} A claim that a jury verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

*a. Drive-by shooting offenses*

{¶ 152} Dean argues that the evidence is not sufficient to support his convictions for two counts (Counts Five and Six) of discharging a firearm into an occupied structure (604 and 609 Dibert) and four counts of attempted murder (Counts Seven through Ten) during the drive-by shootings. He asserts that these convictions are supported solely by Kaboos's testimony. He argues that Kaboos was not a credible witness and that her testimony was contradicted by Shanta Chilton and Devon Williams.

{¶ 153} Kaboos testified that she was in the back seat of the Riviera when Dean and Wade drove down Dibert Avenue. According to her, Wade was driving and was armed with a "black .45" and Dean was in the front passenger seat with a "smaller silver gun." Kaboos saw both men stick their guns out the window and start firing shots when they drove down Dibert Avenue. Kaboos then covered her ears, closed her eyes, and ducked down in the backseat. She felt the car speed up and turn around but that was the last thing she remembered.

{¶ 154} Shanta Chilton testified that when the car returned, she saw a "white guy," who was driving, look at her and start shooting. Williams testified that he was on the street by his car. He saw a person, whom he later identified as Wade, shooting at the house, but he did not see anyone else in the car.

{¶ 155} Dean argues that Kaboos lacked credibility because she changed her story to the police and because her testimony that she did not recall the second round of gunshots was not believable. However, the weight to be given evidence and the credibility of witnesses are primarily jury issues. *See, e.g., State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79; *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 156} Other evidence showed Dean's involvement in these offenses. Manns testified that Dean said that he "shot at people coming out of the house; and one of them was holding a baby in his arms that he almost shot because the bullet actually went through his shirt sleeve." Testimony showed that a Riviera, like the car Dean owned, was the car used in the drive-by shooting. The police also recovered a .25-caliber bullet that hit Williams's car and a .40-caliber bullet from Williams's house. This ammunition was of the same caliber gun that Dean had at the Mini Mart and that Wade had when Arnold was murdered.

{¶ 157} Investigators testified that four bullets struck the front porch area where the four people were standing during the drive-by shooting. Two of the bullets were recovered. Shepherd testified that a bullet recovered from a front porch pillar was "probably" a .40-caliber Smith and Wesson bullet. In addition, a spent bullet found inside the house was identified as a .40-caliber Smith and Wesson bullet. Based on the foregoing, we hold that there was sufficient evidence to support Dean's convictions for the four attempted murders and the offense of discharging a firearm into the home at 609 Dibert.

{¶ 158} As for discharging a firearm into 604 Dibert, Dean argues that even assuming that he was in the car with Wade, there is no evidence that he intended to

fire shots into Byrd's home. Dean argues that the first round of firing was aimed at Williams's car and not the house.

{¶ 159} Dean was convicted of a violation of R.C. 2923.161(A), which provides: "No person, without privilege to do so, shall knowingly * * * (1) [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." "Knowingly" was defined in former R.C. 2901.22(B), Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866, 1898, as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 160} Williams's car was parked in front of 604 Dibert during the drive-by shooting. Evidence established that several shots were fired at the vehicle where it was parked and that two bullets entered the living-room area of the house. Under these circumstances, the jury could reasonably conclude that Dean was aware he would probably hit the house behind the car if his shots ricocheted off the vehicle or missed the vehicle. Accordingly, we hold that there was sufficient evidence to establish Dean's guilt for discharging a firearm into the home at 604 Dibert.

{¶ 161} In his argument that the convictions were not supported by the manifest weight of the evidence, Dean continues to argue that there is no credible evidence upon which the jury could have determined that he was in the car or that he was involved in the drive-by shootings. Dean's challenge to Kaboos's testimony is not convincing. This is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Dean fails to mention Manns's testimony that Dean himself claimed that he was involved as well as circumstantial evidence showing his involvement in the drive-by shootings. Given the strength of the direct and circumstantial evidence, we conclude that the

jury neither lost its way nor created a miscarriage of justice in convicting Dean of discharging a firearm into an occupied structure as charged in Counts Five through Ten and of attempted murder as charged in Counts Seven through Ten.

*b. Arnold's murder by prior calculation and design*

{¶ 162} Dean argues that there insufficient evidence to show that he had prior calculation and design to kill Arnold. On the evening of April 13, Dean and Wade told Kaboos that they were going to the Nite Owl Tavern to rob someone. Around 11:45 p.m., a surveillance camera in the tavern showed Dean and Wade entering the building and leaving a short time later. Shortly after, Haile saw a tall man and a shorter man chasing a man down High Street. Haile saw "blue flashes," heard gunshots, and saw the man who was being chased fall down. She then saw two men hover over the body, run back to their car, and drive away.

{¶ 163} On the same evening, Nawman and Panstingel, who lived at the corner of High and Race Street, heard a shot outside their home. Nawman testified that she saw a shorter man standing over a person on the ground. She then saw him running down High Street toward a car. It appeared someone was already in the car because she saw that the brake lights were on. Panstingel provided similar testimony.

{¶ 164} Around the same time, Terri and Kari Epperson were at their mother's home on West High Street. Terri looked out an upstairs window and saw a man running down the street with two men chasing him. Terri went outside and saw a person get out of the driver's side of a car, run down the street, and shoot twice at a man who was running. The shooter returned to the car and drove away. Terri recognized the shooter as her cousin, Wade. Kari provided similar testimony. She saw a man running down High Street and fire a gun twice. Kari also recognized Wade as the shooter, but she did not see anyone else with him.

{¶ 165} Investigators recovered .40-caliber shell casings and an unspent .25-caliber bullet at the crime scene. Police later seized a .40-caliber handgun from

Dean's residence. Expert testimony established that the .40-caliber shell casings found at the scene were fired from the handgun seized at Dean's house.

{¶ 166} Dean told several people about Arnold's murder. He told Kaboos that he and Wade were driving down the street and saw an individual walking by himself. He and Wade stopped the car, pulled out their guns, and ordered Arnold to lie on the ground. Arnold started to run, and Dean tried to shoot him, but his gun was on safety. Wade then shot Arnold, and he and Dean stole six dollars from him. Bowshier testified that Dean said he and Wade "had smoked somebody and robbed them" and that Dean said he had tackled Arnold, but "his gun didn't go off; and then the kid Josh shot him." Sions heard Dean say that Arnold's murder was a case of mistaken identity and that they had intended to shoot O-Z rather than Arnold. Dean also told Manns about the murder and provided a description of the events that was similar to what he told Kaboos.

{¶ 167} No bright-line test exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' " *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997). Instead, a case-by-case method must be employed in reviewing the evidence. *State v. Goodwin*, 84 Ohio St.3d 331, 344, 703 N.E.2d 1251 (1999). Dean gave different accounts of his motives that night, telling Kaboos that he planned to rob someone. Sions testified that Dean and Wade had it out for O-Z and that it was supposed to be O-Z, not Arnold, who was shot.

{¶ 168} Dean and Wade confronted Arnold as he was walking on High Street. Dean attempted to shoot Arnold when he tried to run away during the robbery. Even though Wade was the shooter, Dean was in control of the night's events. Dean was 30 years old and Wade was 16. Wade was driving Dean's car and Dean's gun was the murder weapon. It is readily apparent from these facts that sufficient time, reflection, and acts were involved to establish that Dean acted with prior calculation and design.

{¶ 169} Dean argues that the state's evidence was based on his admissions to three discredited witnesses who were not at the scene. He contends that their testimony was contradicted by the Epperson sisters, who saw Wade fire the shots and did not see another person with him. But Dean overlooks the testimony of Haile, who was at the scene and saw both a tall man and a shorter man chasing the victim. Dean also fails to mention that Sions testified that she heard Dean and Wade talking about the murder. Furthermore, the credibility of the state's witnesses is a jury issue and not a proper matter on review of sufficiency of the evidence. *See Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 79. Thus, we reject Dean's claims.

{¶ 170} Dean also argued that the finding that he acted with prior calculation and design was not supported by the manifest weight of the evidence. Again, this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The evidence of guilt was overwhelming. The jury neither lost its way nor created a miscarriage of justice in convicting Dean of Arnold's murder.

*c. Attempted aggravated robbery and attempted murder of Lyles at the Mini Mart*

{¶ 171} During the early morning of April 10, 2005, Lyles drove Piersoll to the Mini Mart. Lyles testified that Dean approached the car parked outside the Mini Mart and tried to sell them some pills while she was giving money to Piersoll to go in the store. Lyles refused. Piersoll testified that he first saw Dean inside the Mini Mart and that Dean followed him to the car. Dean then tried to sell him some Valiums, but Piersoll told him no. Lyles testified that Dean then walked over to the Riviera where a younger boy was waiting and they drove away.

{¶ 172} According to Piersoll, he and Lyles remained at the Mini Mart for another five or ten minutes. Neil Scott, an acquaintance of Piersoll's, came to Piersoll's side of the car and started talking with them. Lyles testified that Dean

then came around the corner of the Mini Mart toward her side of the car. Dean yelled, "Give me your money," and started shooting. Glass started flying, and Piersoll said he had been hit. Lyles said she "froze for a second" and then backed up and drove to the hospital. Lyles had scratches on her face as if she had been "grazed."

{¶ 173} Piersoll testified that he heard Lyles say, "Oh shit," and then Dean ran towards the car and started shooting. Piersoll said that Dean did not say anything to them before he started firing the gun. Piersoll was shot in the arm. Piersoll told Lyles, "I'm hit," and she drove to the hospital.

(1) Attempted aggravated robbery of Lyles

{¶ 174} Dean argues that the only evidence of attempted theft was provided by Lyles and that Piersoll contradicted Lyles's assertion that Dean demanded money before he started firing shots. Dean also argues that Lyles's belief that he tried to rob her defies logic, because there was no reason for him to demand money and then immediately start shooting at the car.

{¶ 175} Although theft requires that the accused actually obtain or exert control over the property, attempted theft has no such requirement. R.C. 2923.02(A) defines attempt as "conduct that, if successful, would constitute or result in the offense." "Criminal attempt" has been defined as " 'an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime.' " (Brackets sic.) *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 101, quoting *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus, *judgment vacated on other grounds*, 438 U.S. 910, 98 S.Ct. 3133, 57 L.Ed.2d 1153 (1978). "A 'substantial step' requires conduct that is 'strongly corroborative of the actor's criminal purpose.' " *Id.*, quoting *Woods* at paragraph one of the syllabus.

{¶ 176} Dean's demand for money and his firing shots at the car meets the "substantial step" criterion in the attempted robbery of Lyles. Dean's claim that

Lyle's testimony was contradicted by Piersoll merely placed the credibility of the witnesses in issue. But the weight and credibility of the testimony are jury issues. *See Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 79. The jury viewed the demeanor of Lyles and Piersoll and heard their testimony, inclusive of any contradictions or inconsistencies.

**{¶ 177}** We hold that the testimony of Lyles was sufficient to find Dean guilty of attempted aggravated robbery. *See State v. Dawson*, 5th Dist. Licking No. 2008-CA-122, 2009-Ohio-2331, ¶ 33 (the testimony of one witness, although it may be contradicted by another, is sufficient to prove a fact if the trier of fact finds that witness more credible).

(2) Attempted murder of Lyles

**{¶ 178}** Dean argues that there was insufficient evidence that he intended to kill Lyles, because the evidence—shots that were aimed at the passenger seat and the angle of the shots fired—shows that the shooter was trying to kill Piersoll. But the evidence shows Dean knew that Lyles had money when he tried to sell her pills earlier. He approached the driver's side of the car and yelled, "Give me your money." He started shooting and three bullets hit the windshield on the driver's side of the car.

**{¶ 179}** The jury could reasonably conclude that Dean's demand for money when he started shooting at the car showed that he was targeting Lyles.

**{¶ 180}** The defense also argues that Dean's failure to shoot at Scott, Piersoll's acquaintance, shows that the shooter was targeting Piersoll. This argument also lacks merit. Piersoll testified that when Dean started shooting, "Neil kind of fake threw something at him, I guess, and he ran. That was it." Dean argues that it is significant that Dean did not shoot at Scott when Scott was the only person that offered any resistance. But this fails to explain how Dean's failure to shoot at Scott shows that he was not trying to kill Lyles.

{¶ 181} We hold that there is sufficient evidence to support Dean's conviction for the attempted murder of Lyles.

*d. Course-of-conduct specifications*

{¶ 182} Dean argues that there is insufficient evidence to support his convictions for the course-of-conduct specification, R.C. 2929.04(A)(5), because the underlying offenses were not related. However, this claim also lacks merit.

{¶ 183} In *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, we held:

> The statutory phrase "course of conduct" found in R.C. 2929.04(A)(5) requires that the state establish some factual link between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact "must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together."

(Ellipsis sic.) *Id*. at syllabus, quoting *State v. Cummings*, 332 N.C. 487, 510, 422 S.E.2d 692 (1992). *Sapp* further held that the "factual link might be one of time, location, murder weapon, or cause of death. * * * It might involve a similar motivation on the killer's part for his crimes, a common getaway car, or a similar pattern of secondary crimes (such as rape) involving each victim." *Id*. at ¶ 52.

{¶ 184} Dean's offenses were part of a crime spree that occurred over a four-day period. The offenses all occurred in or around Springfield and involved the same caliber of handguns. Evidence, including Kaboos's statement that Dean drove the Riviera and another witness's testimony that the distinctive sound of the

car present at the Nite Owl Tavern at the time of the shootings matched a recording of the sound of Dean's Riviera, also indicated that the offenses involved the same car. The state also argues that the crimes involved the same motive. Similar motive is not required to establish a factual link. But evidence showed that robbery was a motivating factor for the Mini Mart offenses and Arnold's murder. Thus, the facts establish that the murder of Arnold and the attempted murder of the other victims were linked by time, location, and the caliber of weapons used. *Id.*

**{¶ 185}** Dean continues to argue that no credible evidence supports his conviction for Arnold's murder or the drive-by shootings on Dibert Avenue. But as discussed earlier, Dean's challenge to the sufficiency of the evidence for these offenses lacks merit. Dean also argues that he cannot be found guilty of the R.C. 2929.04(A)(5) course-of-conduct specifications, because he was not the principal offender—i.e., the actual killer—of Arnold. However, we have previously rejected that argument. *See State v. Herring*, 94 Ohio St.3d 246, 252, 762 N.E.2d 940 (2002) ("R.C. 2929.04(A)(5) contains neither an express requirement of prior calculation and design nor an express requirement that the offender be the actual killer").

**{¶ 186}** Based on the foregoing, we overrule Proposition of Law II.

*B. Penalty-phase issues*

1. *Reintroduction of trial-phase evidence* (Proposition of Law XIV)

**{¶ 187}** Dean argues that the trial court erred by admitting trial-phase evidence during the penalty phase. Over objection, the trial court allowed the state to reintroduce a number of trial-phase exhibits during the penalty phase. The court also upheld objections to several of the state's exhibits. The trial court also ruled that it was admitting those exhibits that it believed "bears directly upon the weight to be given" to the course-of-conduct aggravating circumstance, R.C. 2929.04(A)(5).

**{¶ 188}** Dean asserts that the trial court erred in admitting the lineup photos from the Mini Mart shooting, the bullets and handgun related to Arnold's murder,

photographs from the Mini Mart and the drive-by shootings and a poster board from the drive-by shooting, Byrd's 9-1-1 tapes, and excerpts from two letters that Dean wrote to Sions. Dean asserts that none of this evidence was relevant to the aggravating circumstance.

> R.C. 2929.03(D)(1) provides that at the penalty stage of a capital proceeding, the court and jury shall consider "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing."

(Ellipsis and brackets sic.) *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 240.

{¶ 189} The trial court identified and readmitted only that evidence that it deemed relevant to the aggravating circumstance and excluded other evidence that the state sought to readmit. *See Lindsey*, 87 Ohio St.3d at 485, 721 N.E.2d 995 (it is a trial court's responsibility to identify and admit only that evidence relevant to the penalty phase). The trial court did not abuse its discretion in readmitting the state's evidence, because all the readmitted evidence bore some relevance to the nature and circumstances surrounding the R.C. 2929.04(A)(5) specification.

{¶ 190} Based on the foregoing, Proposition of Law XIV is rejected.

2. *Instructions on the definition of mitigating factors* (Proposition of Law VIII)

{¶ 191} Dean argues that the trial court provided the jury with the wrong definition of mitigating factors. Dean failed to object to these instructions at trial and thus waived all but plain error. *See State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), syllabus ("The failure to object to a jury instruction constitutes

a waiver of any claim of error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise"). Dean argues that his trial counsel's failure to object to these instructions constituted ineffective assistance of counsel. Dean also argues that the trial court applied the same erroneous definition of mitigating factors in its sentencing opinion. *See* R.C. 2929.03(F) (the trial court, when imposing a sentence of death, shall state in a separate opinion its findings as to the existence of any mitigating factors).

{¶ 192} The trial court provided preliminary instructions to the jury prior to the start of the penalty phase, including the following definition of mitigating factors:

> Mitigating factors are factors that *while they do not justify or excuse the crime of aggravated murder*, nevertheless in fairness, must be considered by you as they call for a penalty less than death.
>
> Mitigating factors are also factors of an individual or an offense that weigh in favor of a decision that a life sentence is the appropriate sentence.

(Emphasis added.)

{¶ 193} The trial court provided final penalty-phase instructions to the jury, including the following definition of mitigating factors:

> Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate.
>
> Mitigating factors are factors that diminish the appropriateness of a death sentence. Mitigating factors *neither excuse nor justify* the aggravated murder. Rather, mitigating factors

are those things which, in fairness, weigh against sentencing the Defendant to death.

(Emphasis added.)

{¶ 194} Pursuant to R.C. 2929.03(F), the trial court stated in the sentencing opinion why the aggravating circumstance that Dean was found guilty of committing was sufficient to outweigh the mitigating factors. The trial court's opinion defined mitigating factors as follows:

Mitigating factors are those factors about Jason Dean or the offense that he committed that weigh in favor of a life sentence rather than a death sentence. Mitigating factors are *not factors that justify or excuse the offense*, but they are the factors, that in fairness, weigh against the imposition of the death penalty.

(Emphasis added.)

{¶ 195} Dean invokes *State v. Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831 (1988), paragraph one of the syllabus, in arguing that the trial court misconstrued the definition of mitigating factors by adding language that mitigating factors neither excused nor justified the offenses. In *Holloway*, the trial court's sentencing opinion stated that " 'a mitigating factor is a circumstance or fact that would tend in some way to reduce the defendant's culpability for the offense he committed.' " *Id*. at 242. *Holloway* held that that the trial court applied a faulty definition of mitigating factors, because mitigation is not about blame or culpability, but rather about punishment. *Id*. at syllabus. In a later decision, we held that an instruction on mitigating factors that included the words "lessening," "weakening," or "excusing" strayed from the definition approved in *Holloway*. *See State v. Getsy*, 84 Ohio St.3d 180, 201, 702 N.E.2d 866 (1998).

{¶ 196} Nothing in the trial court's instructions defined mitigation in terms of blame or culpability. Rather, the trial court emphasized the opposite in informing the jurors that mitigating factors "neither excuse nor justify the aggravated murder." Moreover, " '[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.' " *State v. Jalowiec*, 91 Ohio St.3d 220, 231, 744 N.E.2d 163 (2001), quoting *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus. When viewed in this context, it is clear that the trial court's instructions were not misleading and that they adequately conveyed to the jury that mitigating factors were about punishment, not culpability.

{¶ 197} We hold that the trial court did not commit plain error when it instructed the jurors on the definition of mitigating factors. Moreover, defense counsel were not deficient in failing to object to these instructions, because they were not faulty. Finally, the trial court's definition of mitigating factors in its sentencing opinion was not improper. Proposition of Law VIII is overruled.

3. *Merger* (Proposition of Law XII)

{¶ 198} Dean argues that the trial court erred by failing to merge several noncapital convictions and the firearm specifications during sentencing.

{¶ 199} However, defense counsel's failure to raise the issue of the merger of these offenses and the firearm specifications at trial and thus forfeited all but plain error. *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, _N.E.3d_, ¶ 21.

*a. Merger of offense of discharging a firearm into the habitation at 609 Dibert Avenue with the attempted-murder offenses*

{¶ 200} Dean argues that the trial court erred in convicting and sentencing him for improperly discharging a firearm into 609 Dibert Avenue (Count Five), because that offense and the attempted-murder offenses (Counts Seven through Ten) are allied offenses that resulted from a single act and a single animus.

**{¶ 201}** Dean was sentenced to eight years' imprisonment for discharging a firearm into an occupied structure as charged in Count Five and ten years' imprisonment for each of the four counts of attempted murder charged in Counts Seven through Ten. The trial court also ordered that these sentences be served "consecutively to one [another]."

**{¶ 202}** "[T]he primary legislative statement on the multiplicity issue is found in R.C. 2941.25, concerning allied offenses of similar import." *State v. Childs*, 88 Ohio St.3d 558, 561, 728 N.E.2d 379 (2000). R.C. 2941.25(A) provides: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

**{¶ 203}** The lead opinion in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, stated that R.C. 2941.25(A) requires the sentencing court to first determine "whether it is possible to commit one offense *and* commit the other with the same conduct." (Emphasis sic.) *Id*. at ¶ 48. If the defendant's conduct constituting commission of one offense constitutes commission of the other, then the offenses are of similar import. *Id*. The court must then determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *Id*. at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J., dissenting). If the answer to both questions is yes, then the offenses are allied offenses of similar import that must be merged, and the defendant can be punished for only one. *Id*. at ¶ 50.

**{¶ 204}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, we recently held that *Johnson* was "incomplete because R.C. 2941.25(B) provides that when a defendant's conduct constitutes two or more offenses of *dissimilar* import, the defendant may be convicted of all of the offenses." (Emphasis sic.) *Id.* at ¶ 16. *Ruff* concluded that "two or more offenses of dissimilar

import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or *if the harm that results from each offense is separate and identifiable*." (Emphasis added.) *Id*. at ¶ 23. Accordingly, we held:

> If *any of the following* is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, *each offense caused separate, identifiable harm*, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.

(Emphasis added.) *Id*. at ¶ 25. Moreover, "a defendant's conduct that constitutes two or more offense against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id*. at ¶ 26.

**{¶ 205}** The evidence at trial showed that seven people were inside 609 Dibert Avenue when gunfire erupted outside. Devon Williams went outside and Shanta Chilton followed him. Hassan Chilton, Shani Applin, and JaeAda Applin went out to the front porch, while Shanta's two young children remained inside. While Williams and Shanta were examining Williams's car, Shanta noticed that a car was coming down the street, and she ran toward the house. The car then pulled in front of the house and shots were fired at people on the porch. Manns testified that Dean told him that he had "shot at people coming out of the house; and one of them was holding a baby in his arms that he almost shot because the bullet actually went through his shirt sleeve." Manns also testified that Dean was paid to conduct the drive-by shooting.

**{¶ 206}** Here, the offenses of attempted murder and discharging a firearm into a habitation caused a "separate, identifiable harm." While the drive-by shooting was directed at the people on the porch, the shots fired endangered those inside the house and thereby created harm distinct from the harm to the attempted-murder victims. Thus, we hold that no plain error was committed by not merging these offenses.

*b. Merger of the firearm specifications*

**{¶ 207}** Dean argues that the trial court erred by failing to merge all the firearm specifications into a single three-year term of imprisonment. He claims that the firearm specifications occurred during a course of conduct and should have been merged as required by the statute in effect at the time of the offenses, former R.C. 2929.14(D)(1), Am.Sub.H.B. No. 163, 150 Ohio Laws, Part III, 4620, 4661-4663.

**{¶ 208}** The trial court sentenced Dean to three years on each of the firearm specifications and imposed three consecutive terms of imprisonment. The court stated that "the firearm specifications on Count One, Two, and Three merge [the Mini Mart offenses]; that the firearm specifications on Counts Five, Six, Seven, Eight, Nine and Ten merge [the drive-by shooting offenses]; and that the firearm specifications on Counts Twelve, Thirteen, and Fourteen merge [the aggravated murder and robbery] for the purposes of sentencing."

**{¶ 209}** Former R.C. 2929.14, 150 Ohio Laws, Part III, at 4661, stated:

(D)(1)(a) Except as provided in division (D)(1)(e) of this section, if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in section 2941.141, 2941.144, or 2941.145 of the Revised Code, the court shall impose on the offender one of the following prison terms:

* * *

(ii) A prison term of three years if the specification is of the type described in section 2941.145 of the Revised Code that charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense.

* * *

(b) If a court imposes a prison term on an offender under division (D)(1)(a) of this section, the prison term shall not be reduced pursuant to section 2929.20, section 2967.193, or any other provision of Chapter 2967. or Chapter 5120. of the Revised Code. A court *shall not impose more than one prison term* on an offender under division (D)(1)(a) of this section *for felonies committed as part of the same act or transaction*.

(Emphasis added.)

{¶ 210} Dean was found guilty of the R.C. 2929.04(A)(5) "course of conduct" specification for committing the Mini Mart offenses, the drive-by shooting, and the Arnold murder. Thus, Dean argues that under R.C. 2929.14(D)(1)(b), the firearm specifications accompanying these offenses should have merged into one three-year term of imprisonment, because they were part of the "same act or transaction."

{¶ 211} In *State v. Wills*, 69 Ohio St.3d 690, 635 N.E.2d 370 (1994), we defined the word "transaction" as it was used in a previous firearm-enhancement statute, R.C. 2929.71(B), Am.Sub.S.B. No. 258, 143 Ohio Laws, Part I, 1307, 1143. The same term now appears in the last sentence of R.C. 2929.14(D)(1)(b). *Wills* defined "transaction" as " ' "a series of continuous acts bound together by time,

space and purpose, and directed toward a single objective." ' " *Id*. at 691, quoting *State v. Caldwell*, 9th Dist. Summit No. 14720, 1991 WL 259529, at *12 (Dec. 4, 1991), quoting *State v. Hague*, 9th Summit No. 13859, 1989 WL 50683, *1 (May 10, 1989).

{¶ 212} In *Wills*, the defendant stole a coat from a student at a bus stop and then crossed the street and stole a coat from a different student. *Id*. at 690. Based upon these facts, Wills was convicted and sentenced on two counts of aggravated robbery and two separate firearm specifications. *Id*. Finding that the firearm specifications did not merge as part of the "same act or transaction," *Wills* explained:

> By applying this standard to the present case, we conclude that the armed thefts * * * were not part of a series of continuous acts. Wills and his cohorts singled out Stone first, surrounded him, pulled out a gun and then under threat of force robbed him. After completing this task they then targeted Thomas, surrounded him, beat him, pulled out a gun, and then robbed him. Wills should serve no less time because of the coincidental proximity of his two victims.

*Id*. at 691.

{¶ 213} In *State v. Keene*, 2d Dist. Montgomery No. 14375, 1996 WL 531606 (Sept. 20, 1996), the court addressed similar arguments to those made here. In *Keene*, the defendant was found guilty of five R.C. 2929.04(A)(5) course-of-conduct specifications. The trial court also sentenced the defendant on five separate firearm specifications, finding that none of them were part of the "same act or transaction." *Id*. at *18. Keene argued that by successfully claiming that the five homicides were not part of the "same act or transaction," the state admitted that the

homicides were not part of "one course of conduct," thereby precluding the court from finding him guilty of the R.C. 2929.04(A)(5) specifications. *Id.* In rejecting these arguments, the court of appeals held that " 'same action or transaction' connotes criminal activities more closely related than actions sufficient to constitute a 'course of conduct.' " *Id.* at \*19. The court noted that these "murders occurred over a sixty-hour time span. Under these circumstances, we find no error or inconsistency in the trial court failing to merge Keene's firearm specifications while finding him guilty on five 'course of conduct' capital-murder specifications." *Id.*

**{¶ 214}** The Mini Mart offenses, the drive-by shootings, and Arnold's murder occurred on different days and at different locations and involved separate victims. Thus, these events were not part of "the same act or transaction" for purposes of R.C. 2929.14(D)(1)(b), and the court committed neither error nor plain error in failing to merge the firearm specifications into a single specification.

*c. Merger of the weapons-under-disability counts*

**{¶ 215}** Dean argues that the trial court erred by failing to merge the four counts of having a weapon under a disability and that he should have been sentenced on only one of these counts, because his possession of firearms was part of a continuous course of conduct.

**{¶ 216}** Counts Four, Eleven, Fifteen, and Sixteen charged Dean with having a weapon under a disability. Three of these offenses (Counts Four, Eleven, and Fifteen) coincided with the dates of the theft, the drive-by shootings, and the murder. The evidence showed that Dean possessed a gun on these occasions. The date of the fourth offense (Count Sixteen) occurred on the date of Dean's arrest when the .40-caliber handgun was found in his home. These counts were tried by the court after Dean waived a jury as to these offenses, and he was found guilty as to each count. Dean was sentenced to consecutive terms of five years for each count.

{¶ 217} Dean possessed a handgun on four separate occasions at different times and locations. Each offense occurred with a separate animus, meaning a separate purpose or intent. Thus, the "same conduct" did not result in multiple convictions, and no plain error occurred in failing to merge these offenses. *See State v. Hairston*, 10th Dist. Franklin No. 06AP-420, 2007-Ohio-143, ¶ 32; *State v. Land*, 8th Dist. Cuyahoga App. Nos. 70875 and 70876, 1997 WL 607540 (Oct. 2, 1997), *4.

### d. Weapons-under-a-disability charges and firearm specifications

{¶ 218} As a final matter, Dean argues that a charge of having a weapon while under a disability is an allied offense of similar import with a firearm specification. The weapons-under-a-disability counts did not include a firearm specification. Yet Dean argues that the firearm specifications that accompanied other counts should have merged with the weapons-under-a-disability counts.

{¶ 219} R.C. 2941.25 addresses the merger of two or more offenses. Dean cannot rely on it to argue that the sentences imposed for the firearm specifications, which are sentence enhancements, must merge with the weapons-under-a disability counts. *See State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 16-19 (the offense of discharging a firearm into a habitation and a firearm specification are not allied offenses of similar import); *State v. Cannon*, 8th Dist. Cuyahoga No. 100658, 2014-Ohio-4801, ¶ 58 (having a weapon under a disability not an allied offense of similar import to a firearm specification). This claim also lacks merit.

{¶ 220} Based on the foregoing, we reject Proposition of Law XII.

### 4. *Trial court's statements* (Proposition of Law XIII)

{¶ 221} Dean argues that the trial judge made two sets of statements indicating that he had predetermined the sentence and had an animus against the defendant that denied him due process and a fair trial.

**{¶ 222}** First, Dean complains about the trial judge's comments that were directed to him after the jury returned its penalty-phase recommendation of death: "Mr. Dean, you are notified * * * that an automatic appeal will be filed for you directly at the Supreme Court of Ohio *after the death sentence is imposed* and that you have the right to appeal without prepayment of any costs necessary for appeal." (Emphasis added.) According to Dean, this statement shows that the trial judge had already decided on a death sentence before engaging in the weighing process required under R.C. 2929.03(D)(3).

**{¶ 223}** Defense counsel did not object to these comments or ask the judge to recuse himself, or raise the issue of the judge's alleged bias before the chief justice pursuant to R.C. 2701.03, which establishes procedures for filing an affidavit of disqualification against a common pleas judge. Ohio Constitution, Article IV, Section 5(C) provides: "The chief justice of the supreme court or any judge of that court designated by him shall pass upon the disqualification of any judge of the courts of appeals or courts of common pleas or division thereof." This provision vests exclusive authority in the chief justice or her designee to pass on disqualification matters. *See Beer v. Griffith*, 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978). Having failed to bring his bias claim in an affidavit for disqualification under R.C. 2701.03, Dean is " 'foreclosed from bringing such a complaint,' " on this appeal. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 65, quoting *State v. Moore*, 93 Ohio St.3d 649, 650, 758 N.E.2d 1130 (2001).

**{¶ 224}** Not only has Dean waived this argument, the argument itself lacks merit. The judge apparently misspoke when making his comments after the jury returned its recommendation on the death penalty. But " '[i]solated remarks made by a judge near the end of a three-or four-week trial are not sufficient to prove that the judge is biased or prejudiced.' " *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 144, quoting *In re Disqualification of Ambrose*, 110 Ohio

St.3d 1220, 2005-Ohio-7154, 850 N.E.2d 722, ¶ 5.  Moreover, neither the defense nor the state brought the comment to the judge's attention.

**{¶ 225}** Dean's claims are also belied by the trial court's sentencing opinion.  The trial court's lengthy opinion shows that the judge carefully considered all the evidence, the arguments of counsel, and the applicable law before finding that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt.  *See* R.C. 2929.03(F).  Thus, the judge's comment does not show that Dean was denied due process and a fair trial.

**{¶ 226}** Second, Dean argues that the trial judge demonstrated bias in making the following comments after pronouncing the death sentence:

> Mr. Dean, it may sound ridiculous to you that I have sentenced you to death plus an additional 125 years of imprisonment.  However, as difficult and as painful as it is for me to impose the death sentence upon you, I know that a lot of things can happen to that sentence prior to its imposition.  Therefore, I want to make sure that you understand that it is my fervent hope that you never walk the streets again as a free man.

**{¶ 227}** It was not improper for the judge, in explaining his sentence, to make critical statements to Dean about his conduct based on evidence presented in court.  *See In re Disqualification of Huffman*, 135 Ohio St.3d 1296, 2013-Ohio-1615, 987 N.E.2d 689, ¶ 6.  As the United States Supreme Court explained:

> The judge who presides at trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.  But the judge is not thereby recusable for bias or prejudice, since his

knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.

*Liteky v. United States*, 510 U.S. 540, 550-551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

{¶ 228} The trial court's statements were founded on facts taken from the record and not an extrajudicial source. And although the statements reflect the judge's opinions about Dean's conduct, they do not indicate that the judge possessed a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Id*. at 555. Thus, we hold that the judge's comments did not exhibit a bias that deprived Dean of due process or a fair trial.

{¶ 229} Based on the foregoing, Proposition of Law XIII is overruled.

*C. Imposition of court costs*

{¶ 230} In Proposition of Law VII, Dean argues that the trial court imposed court costs on him without considering his ability to pay those costs. Without objection, the trial court imposed court costs on Dean at the conclusion of the trial.

{¶ 231} We have held that R.C. 2947.23 requires a trial court to assess costs against all criminal defendants, even if the defendant is indigent. *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. A trial court may waive the payment of costs imposed if the trial court finds that the defendant is indigent. *Id*. at ¶ 14. But "[a] motion by an indigent defendant for waiver of the payment of costs must be made at the time of sentencing." *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, paragraph two of the syllabus. Otherwise, the issue is waived and costs are res judicata. *Id*. at ¶ 23. Accordingly, the trial court was not required to consider Dean's ability to pay before ordering him to pay

court costs. Defense counsel's failure to object at the time the court imposed costs constitutes waiver.

**{¶ 232}** In the alternative, Dean asserts that counsel's failure to object to the imposition of court costs constituted ineffective assistance of counsel. Dean argues that he was prejudiced, because money from his prison account will be taken to satisfy this obligation. *See* R.C. 5120.133(A); *Threatt* at paragraph one of the syllabus (state may use any collection method that is available to collect a civil money judgment or R.C. 5120.133 to collect from a prisoner's account).

**{¶ 233}** In order to prevail on an ineffectiveness claim, Dean must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the outcome of the proceedings would be different. *Strickland*, 466 U.S. at 687-694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Dean has failed to show a reasonable probability that the trial court would have waived the imposition of court costs even if his counsel asked the court to do so. Thus, this claim lacks merit. *See State v. Smith*, 12th Dist. Warren No. CA2010-06-057, 2011-Ohio-1188, *rev'd on other grounds*, 131 Ohio St.3d 297, 2012-Ohio-781, 964 N.E.2d 423, ¶ 11.

**{¶ 234}** As a final matter, Dean argues that the trial court erred by failing to advise him of the community-service notification set forth in former R.C. 2947.23(A)(1),[7] Am.Sub.S.B. No. 71, 150 Ohio Laws, Part V, 8384, 8412, which was in effect at the time of his sentencing, and provided:

> In all criminal cases, including violations of ordinances, the
> judge or magistrate shall include in the sentence the costs of

---

[7] R.C. 2947.23(A)(1)(a) has been amended and now requires that the judge or magistrate give the community-service notification only if "a community control sanction or other nonresidential sanction" is imposed. 2012 Sub.H.B. No. 247.

prosecution and render a judgment against the defendant for such costs. At the time the judge or magistrate imposes sentence, the judge or magistrate shall notify the defendant of both of the following:

(a) If the defendant fails to pay that judgment or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform community service in an amount of not more than forty hours per month until the judgment is paid or until the court is satisfied that the defendant is in compliance with the approved payment schedule.

(b) If the court orders the defendant to perform the community service, the defendant will receive credit upon the judgment at the specified hourly credit rate per hour of community service performed, and each hour of community service performed will reduce the judgment by that amount.

{¶ 235} The trial court imposed costs but did not notify Dean of the community-service provisions. In *State v. Smith*, 131 Ohio St.3d 297, 2012-Ohio-781, 964 N.E.2d 423, we held that the foregoing statutory provisions are mandatory and a trial court must put a criminal defendant on notice of their content at the time of sentencing. *Id.* at ¶ 10. The trial court erred by not informing Dean of the community-service notification. However, the failure to provide this notification was not prejudicial, because Dean received the death penalty. Thus, this claim lacks merit.

{¶ 236} Based on the foregoing, Proposition of Law VII is rejected.

*D. Prosecutorial misconduct*

**{¶ 237}** In Proposition of Law IV, Dean argues that the prosecutor committed misconduct during both phases of the trial. However, except where noted, defense counsel failed to object and waived all but plain error. *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus.

**{¶ 238}** The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

1. *Trial-phase claims of prosecutorial misconduct*

**{¶ 239}** First, Dean argues that the prosecutor improperly elicited victim-impact evidence about Arnold's life during Michelle Cherry's testimony. Cherry testified that Arnold was working at Visions for Youth, a group home for disadvantaged kids, on the night he was killed. Cherry knew Arnold's parents and had known Arnold since he was a baby. She testified that Arnold had three children. Arnold worked the second shift (4:00 p.m. to midnight) and Cherry worked the third shift. Cherry stated that she would come to work early so that Arnold could get home to his family. Cherry also testified that Arnold and other employees did not carry substantial amounts of cash, because the youth at the home might steal it. She added, "[T]he only time we had money" was to buy little things for them if they were "acting good."

**{¶ 240}** Victim-impact evidence is admissible in certain circumstances. It is admissible when it is related to the facts attendant to the offense. *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995). It has also been permitted in limited situations when the testimony is not overly emotional or directed to the penalty to be imposed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 237; *State v. Hartman*, 93 Ohio St.3d 274, 292, 754 N.E.2d 1150 (2001).

{¶ 241} Cherry's testimony about Arnold's job was relevant to explain why he was in the area at the time he was murdered. Testimony that Arnold carried only enough money to buy "little things" for the kids was also relevant to explain why he was robbed of only a small amount of money. Testimony about Arnold's family was of more questionable relevance; however, such testimony was not overly emotional or directed at the penalty to be imposed. Thus, no plain error occurred.

{¶ 242} Second, Dean argues that the prosecutor introduced racism by presenting a recording of Dean's phone conversation with an unidentified individual in which Dean stated that the prosecutor was not offering a deal because they had killed a "moon cricket." This statement was highly relevant because it was an admission of Dean's involvement in Arnold's murder and helped prove his guilt of aggravated murder. The fact that Dean used a racist remark in referring to Arnold does not make his comments any less admissible. Thus, no prosecutorial misconduct occurred.

{¶ 243} Third, Dean argues that the prosecutor exploited Dean's alleged racism during the rebuttal closing argument by replaying the recording of Dean's phone conversation and by arguing, "To this Defendant and his codefendant, Titus Arnold was a slur. That's what he was." During closing arguments, defense counsel had downplayed Dean's comments in his phone conversation by arguing,

> When the day is done, there's no question the words the State has tried to put in Mr. Dean's mouth through those people, the words that came out of his mouth in his writings and this tape sitting right here bring you pretty close; but how close? How close, puffing and the bragging and the talking you do in lockup. You know, who's shocked and why?

**{¶ 244}** Both parties have latitude in responding to arguments of opposing counsel. *See Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 200. Dean's phone conversation showed that Wade did not act alone and Dean took responsibility for Arnold's murder. Dean's conversation also refuted defense arguments that the state tried to put words into Dean's mouth. Thus, the replay of Dean's phone conversation was proper because it allowed the jury to hear Dean's comments and decide whether Dean meant what he said or was just bragging.

**{¶ 245}** The prosecutor's comment, "To this defendant * * * Arnold was a slur," represented fair comment on Dean's actions and had no demonstrable prejudicial effect considering the strength of the state's evidence showing that he was guilty of murder. Thus, no plain error occurred. *See State v. Tompkins*, 2d Dist. Clark No. 95-CA-0099, 1996 WL 612855, *13 (Oct. 25, 1996) (comment about defendant being racist not improper when the characterization is reasonably supported by the evidence and no substantial prejudice results).

2. *Prosecutorial misconduct during penalty-phase arguments*

**{¶ 246}** Dean also asserts that the prosecutor committed misconduct during the penalty-phase arguments. First, Dean argues that the prosecutor improperly argued that society demands a greater punishment for those who kill or attempt to kill several people:

> If you believe that as a society we need more for people who kill and attempt to kill multiple victims, then that aggravating circumstance deserves great weight. You give it great weight in this weighing process.

**{¶ 247}** It is improper for the prosecutor to make a remark that "implores the jury" to convict in order to meet a public demand. *State v. Byrd,* 32 Ohio St.3d 79, 82, 512 N.E.2d 611 (1987). Here, the prosecutor was not imploring the jury to

return a death sentence because of societal demands. *See State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986) (request that the jury maintain community standards not equivalent to exhortation that the jury succumb to public demand).

{¶ 248} Even were it possible to read the prosecutor's remarks as Dean does, we " 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' " *Tyler*, 50 Ohio St.3d at 40, 553 N.E.2d 576, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In any event, Dean cannot show prejudice because the trial court correctly instructed the jury on the aggravating circumstance and the proper standard to apply in the weighing process. *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 147. Thus, no plain error occurred.

{¶ 249} Second, Dean asserts that the prosecutor improperly argued that he intended to kill again because a loaded gun had been found in Dean's residence at the time of his arrest. Here, the prosecutor argued:

The three-day period in which this Defendant engaged in a course of conduct which resulted in the aggravated murder of Titus Arnold and resulted in the attempted murder of those six other people from three total scenes should be given great weight in this case; and when you do that, when you look at that aggravating circumstance and the fact that all of the deterrents and * * * all of the incentive that that course of conduct leading up to the murder of Titus Arnold * * * how that failed to stop this Defendant, the fact that *when they found the gun in his house, it was loaded again*.

Mr. Meyers: Objection.

The Court: Sustained.

(Emphasis added.)

{¶ 250} It is not clear that the prosecutor was making an improper argument about Dean's future intent, because the trial court sustained a defense objection before the prosecutor could complete his thought. *See State v. Fears*, 86 Ohio St.3d 329, 335, 715 N.E.2d 136 (1999). The jurors were also instructed not to speculate on what an answer to a question might have been or why an objection was sustained. Thus, no prejudicial error occurred.

{¶ 251} Third, Dean argues that the prosecutor's rebuttal argument conveyed that the jurors had a civic duty to recommend a death sentence. During closing argument, defense counsel discussed Abraham Lincoln and quoted lines from the "Battle Hymn of the Republic" that discussed transfiguration. Defense counsel then argued, "[W]e can't turn back the hands of time. * * * But instead, we can only try to look into the future and see what we can do to make things as right as we can make it; and that right does not require that Jason Dean's life be forfeited, that it be taken from him."

{¶ 252} During rebuttal, the prosecutor argued:

> Ladies and gentleman, this process is not supposed to be about emotion. It's not supposed to be about letters from Abraham Lincoln. * * * It is supposed to be about a weighing process because, under Ohio law, you don't have just unfettered discretion. You have a process that you must go through and make this weight. And here you have an aggravating circumstance that—that is entitled to great weight. Why? *Because you know that a course of conduct involving this many peop*le involves a protection of a community.
>
> Mr. Meyers: Objection.

71

> The Court:  Sustained.

(Emphasis added.)

{¶ 253} The prosecutor's comments about the "protection of a community" addressed defense counsel's impassioned plea for Dean's life that invoked Lincoln, religious themes, and making things right.  The prosecutor's rebuttal represented fair comment.  *See State v. Hill*, 75 Ohio St.3d 195, 202, 661 N.E.2d 1068 (1996) (a rebuttal argument asking jurors to perform " 'a necessary function to maintain the civilized order in society' " responded to defense arguments referring to the Bible, and in the context of the entire trial, did not violate due process).  Moreover, an objection was sustained to the prosecutor's argument, which limited any potential for prejudice.

{¶ 254} Fourth, Dean argues that the prosecutor committed misconduct during his rebuttal argument by attempting to minimize the rule that a solitary juror may prevent the imposition of the death penalty.  *See State v. Brooks*, 75 Ohio St.3d 148, 162, 661 N.E.2d 1030 (1996).  During closing argument, defense counsel stated:

> If one of you, just one of you jurors, man or woman, young or old, if just one of you does not feel right in your heart that death is the appropriate penalty for Jason Dean, you have the power to say no. You have the power to say no and not sign a death verdict; and that is a power that is given to you, imposed upon you, more or less, by the law of the State of Ohio.

{¶ 255} The prosecutor responded in rebuttal argument:

And we've already talked and we'll talk some more about the weighing process; but in the opening statement of Counsel in this case * * * *it's been emphasized that just one of you* * * the Court has already given instructions as to how you are to conduct deliberations, that you are to work together to attempt to reach a consensus if you can do so without disturbing your individual conscience.

* * *

No one expects you to get great joy out of signing your name on that verdict form that we talked about several weeks ago when you were here. But you must follow the law. Otherwise * * * we have completely and utterly wasted our time.

**{¶ 256}** The prosecutor's rebuttal represented fair comment. The prosecutor was not trying to minimize the "solitary juror" rule. Rather, the prosecutor was simply urging the jurors to deliberate before voting and follow the law. There is little chance that the jurors were confused. The trial court later instructed the jurors: "One juror alone may prevent a death penalty determination by finding that the aggravating circumstance does not outweigh the mitigating factors by proof beyond a reasonable doubt." Thus, no plain error occurred. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 184-187.

3. *Cumulative effect of prosecutorial misconduct*

**{¶ 257}** Finally, Dean claims that the cumulative effect of the prosecutor's misconduct in presenting victim-impact evidence and themes of Dean's racism prejudiced his rights to a fair trial. This argument lacks merit. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 148. To the extent that Dean invokes the doctrine of cumulative error, that doctrine does not apply because

he cannot point to "multiple instances of harmless error." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 258} Based on the foregoing, Proposition of Law IV is overruled.

*E. Ineffective assistance of counsel*

{¶ 259} In Proposition of Law VI, Dean argues that his counsel provided ineffective assistance of counsel during both phases of the trial. As discussed in Proposition of Law V, both deficient performance and prejudice are required to justify reversal based on ineffective assistance of counsel. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

1. *Failure to remove biased jurors*

{¶ 260} Dean argues that his counsel were ineffective by failing to excuse two biased jurors, juror No. 357 and juror No. 406, with either a challenge for cause or a peremptory challenge.

{¶ 261} Dean argues that juror No. 406 should have been excused because she never gave a firm assurance that she could fairly consider a life sentence. Dean states that when juror No. 406 was asked if she could fairly weigh the mitigating factors against the aggravating circumstance, she said, "I can be fair," but did not provide a yes or no answer.

{¶ 262} Neither juror No. 406's answers on the death-penalty questionnaire nor her answers during voir dire show that she was biased or prejudiced. Juror No. 406's failure to provide a direct response to defense counsel's questions about weighing the evidence does not establish otherwise. Under questioning by the trial court and the prosecutor, juror No. 406 indicated that she was not in favor of the death penalty in every murder case, could follow the trial court's instructions, and would deliberate fairly.

{¶ 263} Dean mentions that juror No. 406 and her husband both worked in the prison system. She had been a nurse in the prison system and her husband was a corrections officer. But Dean presents nothing to show that juror No. 406 was

biased because of her and her husband's former employment. *See State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 37 (parole officer who was not biased permitted to sit on a capital jury); *State v. Murphy*, 91 Ohio St.3d 516, 527, 747 N.E.2d 765 (2001) (police officer who was not biased allowed to sit on a capital jury). Thus, Dean fails to show any evidence to support a challenge for cause of juror No. 406, and this ineffectiveness claim lacks merit. *See State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 76.

**{¶ 264}** Dean has also failed to show that his counsel were ineffective by failing to peremptorily challenge juror No. 406. Decisions on the exercise of peremptory challenges are a part of trial strategy. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 99. Because juror No. 406 did not indicate any bias or prejudice, Dean has failed to establish that his counsel were deficient or that he was prejudiced by counsel's failure to peremptorily challenge this juror. *See Lindsey*, 87 Ohio St.3d at 490, 721 N.E.2d 995. Thus, this claim of ineffectiveness lacks merit.

**{¶ 265}** As for juror No. 357, Dean raises the same ineffectiveness claim that he made in Proposition of Law V. However, as discussed in that proposition, Dean cannot demonstrate that his counsel were ineffective by failing to excuse juror No. 357 through either a challenge for cause or a peremptory challenge.

2. *Trial-phase ineffectiveness*

**{¶ 266}** Dean argues that his counsel were unprepared and committed a number of errors during the trial-phase proceedings.

### a. Unprepared to cross-examine Kaboos

**{¶ 267}** Dean argues that defense counsel were ineffective because they were unprepared to cross-examine Kaboos. During cross-examination, Kaboos testified that no one was watching her children in Missouri while she was living with Dean. Kaboos said, "I didn't have any children 'til 2006." Following her testimony, Kaboos was excused as a witness and returned to Missouri.

**{¶ 268}** After Kaboos had departed, defense counsel informed the court that he had been ineffective by failing to impeach Kaboos with her earlier police statement. In that videotaped statement, Kaboos told police that she decided to report Dean for the offenses, " 'Cause that man that died over $6 in his pocket because they robbed him has three babies, and *I have a little boy in Missouri*; and it just kills me, and I feel the family should have the right to know anything that happened to him." (Emphasis added.)

**{¶ 269}** In Kaboos's absence, defense counsel sought to present relevant portions of Kaboos's videotaped statement to the jury. The prosecutor objected and stated that after the defense raised this issue, they talked to Kaboos on the phone. According to the prosecutor, Kaboos told them that "she was helping her boyfriend raise his child by another woman and treated him like a stepson" and the "first child that she gave birth to was in 2006." The trial court ruled that even if Kaboos were brought back to testify, extrinsic evidence of Kaboos's statement would not be admissible, because "[i]t's a collateral matter and doesn't go to anything but her credibility."

**{¶ 270}** Dean argues that Kaboos's credibility was a key issue because she was the only witness that testified that Dean was in the car during the drive-by shootings and she was the only witness who tied him to all three offenses. He argues that impeaching Kaboos with her earlier statement would have shown that Kaboos lied about her motivation for reporting him to the police. But it is highly questionable whether counsel was deficient in failing to cross-examine Kaboos about her earlier statement. If Kaboos has been asked about her statement that she had a little boy in Missouri, it appears that she would have stated that she was referring to her boyfriend's son and not her own. Moreover, extrinsic evidence of Kaboos's possible prior inconsistent statement about her child would have been inadmissible because it involved a collateral matter. *See* Evid.R. 613; Weissenberger, *Ohio Evidence*, Section 613.6, at 126 (2014).

**{¶ 271}** Moreover, Dean fails to establish prejudice. During direct examination, Kaboos admitted she had lied to the police when she originally told them that Dean shot Arnold and that she was not in the car during the drive-by shootings. Kaboos explained that she lied, "Because I was angry. I was scared because he had threatened me and he had put his gun in my mouth, and I was just angry and upset; and I wanted him to pay for what he did, and that was the wrong thing." Thus, it is highly unlikely that cross-examination showing that Kaboos may have been untruthful about her children would have made any difference in the outcome of the case. *See State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 121 ("minor missteps are not tantamount to ineffective assistance; a complaining defendant must still demonstrate prejudice"). Accordingly, we reject this claim.

*b. Failure to cross-examine witnesses*

**{¶ 272}** Dean argues that defense counsel were ineffective by failing to cross-examine some of the state's witnesses. However, "[t]rial counsel need not cross-examine every witness * * *. The strategic decision not to cross-examine witnesses is firmly committed to the trial counsel's judgment * * *." *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996). The record does not show that counsel's decision was unreasonable. Most of the witnesses that Dean complains were not cross-examined gave brief testimony about facts not in dispute. Moreover, Dean does not offer to explain the information that counsel failed to elicit during cross-examination or how he was prejudiced by defense counsel's failure. Thus, we reject this claim.

*c. Failure to object to crime-scene photographs*

**{¶ 273}** Dean claims that his counsel were ineffective by failing to object to any of crime-scene photographs taken at Arnold's murder scene, because many of them were duplicative and emotionally charged. Defense counsel did not object to the admission of 68 photos taken at the murder scene. These photos documented

the scene and the neighborhood where the murder occurred, the location where Arnold's backpack and cell phone were found, the vehicle that was struck by gunfire, the location of shell casings on the street, tire marks left by the getaway car, and markers used by the police in measuring distance.

{¶ 274} Many of the crime-scene photos were cumulative. But the mere fact that there are numerous photographs does not result in prejudicial error, absent gruesomeness or shock value. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 232. These photos were not gruesome. Several of the photos did show bloodstains left on the street after Arnold's body was removed from the scene. But none of these photos showed Arnold's body. *See State v. Smith*, 80 Ohio St.3d 89, 108, 684 N.E.2d 668 (1997) (photographs of bloodstains are generally not gruesome).

{¶ 275} Moreover, Dean's counsel were diligent in objecting to more damaging crime-scene evidence, including an objection to a photo of Arnold's body lying on the street that was overruled. Counsel also made an objection that was sustained to a crime-scene videotape taken on the night of the murder. Accordingly, this claim lacks merit.

### d. Stipulating to evidence

{¶ 276} Dean argues that his counsel were ineffective by stipulating that it was Dean's voice on a taped phone call and stipulating to the transcript of another taped phone call.

{¶ 277} Sions was called as a witness and asked to identify Dean's voice on a taped phone call. But Sions stated that she was unable to identify Dean's voice when the tape was played. The prosecutor then informed the court that the state was going to call other witnesses to identify Dean's voice and authenticate his voice on both tapes but would substitute a transcript from one of the calls. Defense counsel then consulted with Dean and informed the court that counsel had received

Dean's permission to stipulate that his voice was on the tapes. The stipulation was presented to the jury at the close of the state's evidence.

**{¶ 278}** Defense counsel's decision to enter into these stipulations was a "tactical decision" that falls " 'within the wide range of reasonable professional assistance.' " *State v. Green*, 66 Ohio St.3d 141, 148, 609 N.E.2d 1253 (1993), quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Dean argues that counsel should not have stipulated, because Sions was unable to identify his voice. But Dean's argument overlooks the fact that the state was prepared to call other witnesses to authenticate his voice. Thus, defense counsel's willingness to stipulate prevented more prosecution witnesses from testifying in court and allowed the defense to make a display of candor before the jury. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 347.

**{¶ 279}** Dean also argues that defense counsel should not have entered the stipulation because the transcript showed that it had been presented during his first trial. But the trial court had informed the jury that this case had been tried before and instructed the jurors that they "may not consider that fact and the fact that it was tried once before; and you may not consider the prior outcome, if you know, for any purpose whatsoever." Thus, it is highly unlikely that Dean was prejudiced by any reference to the exhibit being from the earlier trial. This ineffectiveness claim lacks merit.

*e. Failure to submit proposed instructions in a timely fashion*

**{¶ 280}** Dean argues that defense counsel failed to submit proposed jury instructions that the court requested. As the trial phase was coming to a close, the judge stated that "having requested draft instructions from both the State and the Defense for numerous occasions over the last several months, I was furnished on Friday a copy of the instructions that were used in the first trial of this case. I have received nothing from the Defense in the form of draft instructions." The judge said that he had furnished his draft instructions to the parties "by e-mail on Sunday

morning with less than an immediate response." The judge added, "I was sent an e-mail late [Monday] with four pages of objections to these instructions that I didn't receive until early [Tuesday] morning. I have now reworked the instructions in accordance with those requests and objections." The judge then reviewed the defense requests, suggested changes to the parties, and finalized the instructions.

{¶ 281} Dean claims that the jurors were improperly charged on key issues in the case because of defense counsel's failure to submit proposed instructions in a timely fashion as the court requested. But Dean does not identify any instructions that were improper or that counsel should have requested. Moreover, defense counsel did provide the court with a comprehensive list of objections and proposed changes to the court's instructions. Taking the objections into consideration, the trial court reworked the instructions before closing arguments began. Thus, Dean has failed to establish either defective performance or prejudice. *See State v. White*, 85 Ohio St.3d 433, 452, 709 N.E.2d 140 (1999).

*f. Failure to object to prosecutorial misconduct*

{¶ 282} Dean argues that defense counsel were ineffective by failing to object to prosecutorial misconduct during closing arguments. Dean recasts his objections to prosecutorial misconduct in Proposition of Law IV in support of this claim. But Dean fails to show deficiency in counsel's performance or that such conduct resulted in prejudicial error. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

3. *Penalty-phase ineffectiveness*

*a. Failure to prepare for mitigation*

{¶ 283} Dean asserts that his counsel were ineffective by failing to adequately prepare mitigating evidence and by presenting only his unsworn statement and the testimony of two family members during the penalty-phase proceedings.

**{¶ 284}** An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521-522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). However, Dean has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 104, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. *See State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217 (death penalty vacated because of failure to conduct thorough and adequate mitigation investigation).

**{¶ 285}** Gloria Elliott, Dean's aunt, and Brandy Murphy, Dean's cousin, testified about his family background and upbringing. Dean also made an unsworn statement in which he expressed remorse and made an impassioned plea for his life.

**{¶ 286}** "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). Defense counsel provided substantial mitigating evidence on Dean's behalf. Moreover, the record does not show that defense counsel failed to investigate the possibility of presenting additional lay testimony. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244 (a court "cannot infer a defense failure to investigate from a silent record").

**{¶ 287}** Dean argues that defense counsel should have called a psychologist or other experts to provide the jury with an explanation for his conduct. Defense counsel employed Dr. Bob Stinson, a forensic psychologist, and Dr. Nicholas

Doninger, and obtained funding for a neuropsychologist, a mitigation specialist, and an investigator. Defense counsel also obtained funding for a radiologist to conduct an MRI examination on Dean. Defense counsel elected not to call any experts during mitigation. At the completion of the mitigation hearing, the trial court and defense counsel had the following exchange:

> THE COURT: * * * The Court just wants the record to reflect that at pretrial, the Court has furnished funds for the expert witnesses, Dr. Stinson and Dr. Doninger for the Defense. The Court would like the record to reflect that the evidence was fully developed by these witnesses for the Defense and that reports have been furnished and Defense Counsel has had adequate opportunity to discuss potential testimony of these witnesses and that, as a matter of trial strategy, the Defense has chosen not to call them as witnesses.
>
> Is that a fair statement, Mr. Meyers?
>
> MR. MEYERS: Well, I would say this, Judge. Certainly, the reports were generated and disclosed, were discovered; and as all things in trial, we on defense make decisions based on our strategy, hope that they're effective.

{¶ 288} "The defense decision to call or not call a mitigation witness is a matter of trial strategy. * * * Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116. It is unclear why defense counsel did not present Dr. Stinson or Dr. Doninger as mitigation witnesses. Nothing in the record shows that this decision was the result of an inadequate investigation. Accordingly, counsel's decision was a matter of trial strategy and does not constitute ineffective assistance

82

of counsel. *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 223.

**{¶ 289}** Nevertheless, Dean argues that a psychologist should have been called to explain his behavior, because that would have precluded the prosecutor from arguing that Dean "turned his back" on those willing to help him and freely chose not to take advantage of the opportunities offered him. But no evidence suggests that Dr. Stinson or Dr. Doninger would have presented testimony that would have precluded such argument. *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 68. Thus, this claim lacks merit.

**{¶ 290}** Finally, Dean argues that counsel should have presented documentary evidence such as his school, medical, or juvenile court records to support his witnesses' testimony. However, there was no showing that defense counsel did not review or investigate Dean's records. In addition, nothing indicates whether Dean's records had mitigating value. Thus, this claim also lacks merit. We hold that Dean has failed to establish that defense counsel were ineffective in preparing for mitigation and presenting mitigating evidence.

### b. Misstating the weighing process

**{¶ 291}** Dean argues that defense counsel misstated the weighing process during closing arguments by telling the jury: "[Y]ou have to weigh the mitigating factors against the aggravating circumstance to determine if the aggravating circumstance outweighs beyond a reasonable doubt—not just outweighs, but outweighs beyond a reasonable doubt—the mitigating factors." Dean argues that defense counsel's argument changed the focus of the deliberations from the state's burden of proof to the relative weight of the factors.

**{¶ 292}** As Dean correctly points out, R.C. 2929.03(D)(1) provides:

The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the

defendant was found guilty of committing are sufficient to outweigh

the factors in mitigation of the imposition of the sentence of death.

**{¶ 293}** Defense counsel's argument was somewhat imprecise. However, any error was harmless. The trial court's final instructions correctly informed the jury about the weighing process, including the state's burden of proof, and cured any misstatements. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147. Thus, this claim is rejected.

### c. Failure to object during closing arguments

**{¶ 294}** Dean argues that counsel were ineffective by failing to object to prosecutorial misconduct during the penalty-phase closing arguments. This claim lacks merit. As discussed in Proposition of Law IV, Dean was not prejudiced by counsel's failure to object to statements made by the prosecutor during closing arguments.

### 4. *Failure to object to imposition of court costs*

**{¶ 295}** Dean argues that his counsel were ineffective by failing to object to the imposition of court costs. But as discussed in Proposition of Law VII, Dean has failed to show a reasonable probability that the trial court would have waived the imposition of costs if asked. Thus, we reject this claim.

### 5. *Cumulative error*

**{¶ 296}** Finally, Dean argues that defense counsel's cumulative errors and omissions violated his constitutional rights. However, because none of Dean's individual claims of ineffective assistance has merit, he cannot establish a right to relief simply by joining those claims together. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 173.

**{¶ 297}** Based on the foregoing, we reject Proposition of Law VI.

### F. Constitutionality

{¶ 298} In Proposition of Law XV, Dean challenges the constitutionality of Ohio's death-penalty statutes and claims that the statutes violate international law and treaties to which the United States is a party. These claims are summarily rejected as having been previously ruled on. *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 215-216.

G. *Appropriateness and proportionality of the death sentence*

{¶ 299} In Proposition of Law I, Dean argues that the death penalty is not an appropriate sentence for him, both because of his history and background and because he was not the principal offender in killing Arnold. Dean also argues that this court should find that his sentence is disproportionate to the life sentence of Wade, his co-defendant. In addition, Dean argues that Ohio's system of proportionality is constitutionally flawed because this court compares only cases in which the death penalty has been imposed. *See State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus. These arguments will be considered in the next section, our independent evaluation of the sentence imposed on Dean.

## IV. Independent sentence evaluation

{¶ 300} Having considered Dean's propositions of law, we must now independently review Dean's death sentence for appropriateness and proportionality as R.C. 2929.05(A) requires.

### A. *Aggravating circumstance*

{¶ 301} Dean was convicted of murdering Titus Arnold as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons (Lyles, Piersoll, Shanta Chilton, Hassan Chilton, Shani Applin, and JaeAda Applin) in violation of R.C. 2929.04(A)(5). Dean was also convicted of the aggravated murder of Arnold while committing or attempting to commit aggravated robbery and although Dean was not the principal offender, the aggravated murder was committed with prior calculation and design, in violation of R.C. 2929.04(A)(7).

Prior to the start of the penalty phase, the state elected to proceed with only the course-of-conduct specification.

{¶ 302} The evidence at trial supports the jury's findings of guilt as to the course-of-conduct aggravating circumstance. The evidence showed that during the early morning of April 10, Dean confronted Lyles and Piersoll while they were seated in Lyles's car at the Mini Mart. Lyles testified that Dean came around the corner of the Mini Mart towards her side of the car, yelled, "Give me your money," and started shooting. Several bullets hit the windshield and Piersoll was shot in the arm. The evidence showed that on the evening of April 12, Dean and Wade conducted a drive-by shooting at 609 Dibert Avenue. Dean and Wade fired at this home while four people were standing on the front porch. Finally, on the evening of April 13, Dean and Wade murdered Arnold.

*B. Mitigating evidence presented*

{¶ 303} Against the course-of-conduct aggravating circumstance, we must weigh the factors contained in R.C. 2929.04(B). Dean called his aunt, Gloria Elliott, and his cousin, Brandy Murphy, as mitigation witnesses to present evidence of his history, character, and background. Dean also made an unsworn statement and a statement in allocution.

1. Gloria Elliott's testimony

{¶ 304} Elliott, Dean's aunt, testified that she was raised with Dean's parents and has known him his entire life. She stated that Dean's father was 20 and his mother was 16 when they married. Dean's mother worked in restaurants but did not hold jobs. His father worked as a punch press operator and did all kinds of things. Dean has two brothers.

{¶ 305} According to Elliott, Dean's parents had a volatile relationship. They argued constantly and had physical altercations. Dean and his brothers lived with Elliott on a number of occasions. Elliott stated that Dean "always kept you going" and was "always doing something funny." She believed that Dean's parents

did not raise their sons properly. Elliott stated that Dean's father was a drinker and his mother smoked pot on a regular basis. Dean also used drugs and alcohol and smoked marijuana with his mother.

{¶ 306} Dean's mother met another man and moved to Sandusky a "couple of times" to be with him. Elliott took the boys when Dean's mother left. Dean was a baby when his mother left home and was not affected too much by the absence. At some point, his mother married another man. Elliott also stated that an elderly gentleman died and left Dean's mother a lot of money. But Dean's mother spent the money "[a]bsolutely, anywhere, everywhere" and never used any of the money to fix up her house, which was later condemned.

{¶ 307} Elliott stated that Jason and his brothers were involved in fist fights with each other and other children and his parents often encouraged him to fight. Dean's parents imposed discipline on him by whipping or beating him. On one occasion when Dean was two or three years old, Elliott intervened when he was beaten repeatedly by his father. Elliott described Dean as "a basically good boy." He followed Elliott's rules and respected her. Elliott stated that she loved Dean with "every ounce I have in me. He's my son. * * * The Dean boys are my sons for all intents and purposes from birth." Elliott did not want to see Dean executed and asked the jury to spare his life.

2. Brandy Murphy's testimony

{¶ 308} Murphy testified that she lived near her cousin Dean's home in Springfield until her parents moved to Florida when she was seven. Afterwards, the two families visited each other on a frequent basis. Murphy, who is two years older than Dean, played with him and his brothers when they were growing up. Murphy moved back to Springfield when she was 15 and lived with the Dean family.

{¶ 309} Murphy never saw Dean and his brothers attend school on a regular basis. She also never saw their parents criticize or discipline the boys for not

attending school. Murphy described the mother's relationship with her children as "[m]ore of a friendship * * * like she was their age, just kind of hanging out, just nonchalant." But Dean's mother would get angry at her sons, and Murphy saw her throw coffee mugs and a telephone at them. Murphy stated that Dean and his brothers were on "pins and needles" around their father. Dean's father would start off cursing and then grab his belt when he became aggravated. Murphy saw him hit Dean with a belt a couple of times a week. She also never saw Dean's father show affection towards any of his children.

{¶ 310} Murphy stated that Dean's parents had a poor relationship. His father would go to work and a boyfriend would come to visit his mother. Dean's father came home while the boyfriend was present on a couple of occasions. The father would want to fight but the boyfriend never left the couch. According to Murphy, neighbors would call the police and "it always resulted in my uncle being arrested." Murphy testified that everyone in the house used marijuana, including Dean when he was 13 years old. Dean's father used alcohol. Dean's parents never punished the boys for using illegal substances.

{¶ 311} According to Murphy, Dean and their friends brought stolen merchandise to their home. Dean's mother did not seem to care. She was more concerned about the police coming to the house because there were stolen goods. She listened to a police scanner and paid attention to descriptions of suspects to see if they matched those of the three boys.

{¶ 312} As a final matter, Murphy stated that she saw Dean's parents engage in physical fights. Dean observed some of the fights, and his mother got beat up pretty badly during them. Dean's father would go to jail but later move back into the house.

### 3. Dean's unsworn statement

{¶ 313} Dean stated that this is a "heavy, heavy, weight for me to carry." He then continued:

88

[T]he first thing I would like to do is to say that there is no scale to weigh the magnitude of the decision that you're about to make, my life. And there's no scale to weigh, you know, the tragedy that this family has to suffer for the loss of their son, father, and brother, uncle. It's beyond my scope of comprehension. It's beyond words. I can't begin to imagine the pain and suffering that they all have to go through for—for not just today but for a lifetime.

And that's what this boils down to, a lifetime, my life; and I've lived a hard life. I've been through ups and downs, sideways, wrong turns, bad decisions; and I'm not the best man, but I'm a man. I'm a human being, and I have family who love and cherish me; and without a doubt, I don't believe that they want to see me strapped to a table and poisoned to death by the State of Ohio. And I know that you never have ever imagined having to do God's work and decide whether a man lives or dies by the stroke of a pen; and I know that's a heavy, heavy weight to carry. And, you know, I just ask that you remember at the beginning of this trial it was constantly referred to as common sense and reason. I ask you, as a man, as a human being, to take these two words into the jury room with you when you deliberate to either save my life or take my life; and that's compassion and mercy. That's all that I ask. Thank you.

4. Dean's statement in allocution

**{¶ 314}** Before final sentencing, Dean thanked his attorneys and thanked the judge for being fair and just throughout the whole trial. Dean also made a plea based on the fact that he was not the principal offender, stating:

You, I, God, and everybody in this courtroom knows I didn't kill Titus Arnold; and I don't have no bitterness, no angry [sic], no animosity toward the family. I really never could wrap my mind around the tragedy that they're going through; but, once again, *I played no part* in Titus Arnold's murder.

(Emphasis added and brackets sic.)

{¶ 315} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender); (B)(5) (lack of a significant criminal record); (B)(6) (accomplice only); and (B)(7) (any other relevant factors).

{¶ 316} The first five statutory mitigating factors do not apply. However, R.C. 2929.04(B)(6) does apply because Dean was not the principal offender in killing Arnold. Indeed, Dean argues that he should not receive the death penalty because Wade fired the shot that killed Arnold.

{¶ 317} Yet Dean's participation in Arnold's murder and the attempted murders was extensive. The evidence shows that Dean was 30 years old and Wade was only 16. Dean exercised great influence over Wade and supplied the car and the weapons used in the offenses. Dean also attempted to shoot Arnold before Wade killed him.

{¶ 318} When the offender plays a critical role as a leader, we have held that the R.C. 2929.04(B)(6) factor will carry less weight. *See Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 267-269 (a leader in Lucasville prison riots who was not an actual killer); *State v. Robb*, 88 Ohio St.3d 59, 91, 723 N.E.2d 1019 (2000) (same); *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 136; (no evidence was shown that defendant killed either victim, but he was a crucial participant in the murders); *State v. Issa,* 93 Ohio St.3d 49, 71-

72, 752 N.E.2d 904 (2001) (participant in murder for hire even though shooter and others did not receive death penalty). Dean played a critical role in Arnold's death, and we give little weight to the R.C. 2929.04(B)(6) factor.

{¶ 319} Some weight should also be given to other mitigating evidence under the catchall provision of R.C. 2929.04(B)(7). Such evidence includes the love that Dean shares with members of his family. His expression of sympathy towards the victim's family is also entitled to weight.

{¶ 320} We find nothing mitigating in the nature and circumstances of the offenses. Dean and Wade went on a four-day crime spree that culminated in the shooting death of Arnold. Dean and Wade stole approximately six dollars from Arnold after he was shot and killed. But Dean's history, character, and background provide some mitigating value. Dean grew up in a dysfunctional family. His parents neglected Dean, did not value his school attendance, and abused alcohol and marijuana in the home. Dean's father whipped Dean with a belt to impose discipline and showed his son no affection. Dean's mother smoked pot with Dean and turned a blind eye to stolen property that her sons brought into the home. Dean's parents also engaged in physical altercations on a frequent basis in front of Dean. On the other hand, Elliott, Dean's aunt, helped raise Dean and his brothers and brought a degree of stability into their lives. Elliott described Dean as "a basically good boy" and stated that he followed her rules and respected her.

{¶ 321} Certainly, Dean lacked parental oversight and had a poor upbringing. Thus, we give weight in mitigation to Dean's background and upbringing. But we have upheld the death penalty for defendants with backgrounds similar to or worse than Dean's. *See, e.g., State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 280-291; *Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 149-159; *State v. Campbell*, 95 Ohio St.3d 48, 50-54, 765 N.E.2d 334 (2002). Moreover, as the state points out, there is no evidence

that Dean suffered from sexual abuse, intellectual deficits, or psychological impairment, which are often factors in many death-penalty cases.

{¶ 322} Dean argues that he should not receive the death penalty because Wade received a life sentence. *See State v. Wade*, 2d Dist. Clark No. 06-CA-108, 2007-Ohio-6611. Wade's lesser sentence is entitled to consideration as a nonstatutory mitigating factor. *See Getsy*, 84 Ohio St.3d at 208-209, 702 N.E.2d 866. But Wade was a juvenile and not subject to the death penalty. Moreover, we have held that "[d]isparity of sentence does not justify reversal when the sentence is neither illegal nor an abuse of discretion." *State v. Jamison*, 49 Ohio St.3d 182, 191, 552 N.E.2d 180 (1990); *see also State v. Stumpf*, 32 Ohio St.3d 95, 108, 512 N.E.2d 598 (1987) (co-defendant's life sentence for his part in the victim's murder not an impediment to affirming the death sentence in defendant's case). Thus, we do not give significant weight to the disparity in sentences between Dean and Wade.

{¶ 323} We weigh the aggravating circumstance of the course-of-conduct specification under R.C. 2929.04(A)(5) against these mitigating factors. Dean was complicit in Arnold's murder, attempted to murder Piersoll and Lyles at the Mini Mart, and attempted to murder Shanta and Hassan Chilton and Shani and JaeAda Applin on the porch at 609 Dibert Avenue. Dean's mitigating evidence is weak in comparison. Dean also showed little remorse for what happened. We find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 324} Finally, we hold that the sentence is both appropriate and proportionate. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836 (one murder and one attempted murder); *State v. Beuke*, 38 Ohio St.3d 29, 526 N.E.2d 274 (1988) (one murder and two attempted murders).

{¶ 325} In reaching this conclusion, we reject Dean's argument that any meaningful proportionality review should include Wade's case. *See Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 419, at syllabus ("The proportionality review required

by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed"). We also reject the claim that *Steffen*'s limited proportionality review is constitutionally flawed. *See id*. at 123.

### V. Conclusion

**{¶ 326}** We therefore affirm the judgments of conviction and sentence of death imposed upon Jason Dean.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, KENNEDY, and FRENCH, JJ., concur.

O'NEILL, J., concurs in part and dissents in part for the reasons set forth in his dissenting opinion in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

_____

D. Andrew Wilson, Clark County Prosecuting Attorney, and Lisa Fannin, Assistant Prosecuting Attorney, for appellee.

McGarry Law Office and Kathleen McGarry; and William S. Lazarow, for appellant.

_____